**John Wesley GREEN**

v.

**Edna L. GREEN, et al.**

Supreme Court of Tennessee,
at Nashville.

Feb. 5, 2009 Session.

Aug. 26, 2009.

---

Eugene N. Bulso, Jr., Steven A. Nieters, and Emily R. Walsh, Nashville, Tennessee, for the appellants, Edna L. Green and Champs–Elysees, Incorporated.

James D.R. Roberts, Jr. and Janet L. Layman, Nashville, Tennessee, for the appellee, John Wesley Green.

## OPINION

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, GARY R. WADE, and SHARON G. LEE, JJ., joined.

This appeal involves an intra-family dispute over the sale of stock in a closely held corporation. After a stockholder declined to honor her contract to convey her stock, the purchaser filed suit in the Chancery Court for Davidson County to compel the seller to complete the sale. The seller counterclaimed for rescission of the contract under Tenn.Code Ann. § 48–2–122(b)(1) (Supp.2008). The corporation in-

tervened and filed a counterclaim against the purchaser seeking to recover misappropriated corporate funds. Thereafter, the seller filed a motion for summary judgment on her rescission claim, and the corporation sought a summary judgment on its misappropriation of corporate funds claim. The trial court granted these motions, and then denied the purchaser's motion to file an amended complaint against the seller, the corporation, and others. The purchaser appealed to the Court of Appeals. The Court of Appeals (1) reversed the summary judgment granting the seller's rescission claim because the seller had failed to prove that she had relied on the purchaser's representations when she contracted to sell her stock, (2) reversed the summary judgment granting the corporation's misappropriation of corporate funds claim because of the existence of a factual dispute concerning the purchaser's authority to write the disputed checks, and (3) reversed the trial court's denial of the purchaser's motion to amend his complaint. *Green v. Green,* No. M2006–02119–COA–R3–CV, 2008 WL 624860 (Tenn.Ct.App. Mar.5, 2008). We granted the Tenn. R.App. P. 11 application for permission to appeal filed by the seller and the corporation. While we have determined that the Court of Appeals erred by making reliance a necessary element of claims under Tenn.Code Ann. § 48–2–122(b)(1), we have determined that the appellate court correctly reversed the summary judgments for the seller and the corporation because of the existence of

genuine disputes regarding the material facts. We have also determined that the appellate court properly reversed the trial court's denial of the purchaser's motion to amend his complaint.

## I.[1]

### THE NEGOTIATIONS AND SALE OF THE CHAMPS-ELYSEES STOCK

Champs–Elysees, Inc. ("Champs–Elysees") began in 1983 in the living room of Edna Green,[2] a former Nashville school teacher. Ever since its founding, Champs–Elysees has been a small, closely held business. The Green family and a small number of other persons have owned and operated the company. Edna Green's sons, John Wesley Green and Mark Green, and her daughter-in-law, Dianne Green, who is married to Wesley Green, have all worked for the company in management positions. Even though Champs–Elysees is modestly capitalized, it is a multi-national corporation with operations and production facilities both in the United States and abroad. It serves customers in scores of countries, and its customer list includes many famous and influential persons, including actors, leading business figures, authors, cartoonists, and United States Supreme Court justices.

Champs–Elysees enables its customers to maintain and improve their ability to read and converse in foreign languages at an intermediate or advanced level. Its innovative service provides customers with a subscription to "audio magazines" that

1. The facts set forth in this opinion are drawn from the current record on appeal. Because the parties have yet to have a full hearing with regard to these facts, our inclusion of any particular fact in this opinion should not be construed as conclusive finding-of-fact that prevents the parties from presenting additional evidence regarding the fact or as preventing the trial court from making contradictory

findings of fact based on the evidence actually presented by the parties.

2. Because many of the parties in this case share the surname "Green," in this opinion, the members of the Green family will be referred to by their first and last names. John Wesley Green, however, will be referred to as "Wesley Green."

enable the customers to improve their mastery of French, German, Spanish, or Italian. The audio magazines include interviews with famous political leaders, actors, and authors, as well as news, music, and cultural highlights. Included with the audio portion of the magazine are a transcript and vocabulary section and annotations about the cultural and linguistic issues arising in the particular magazine.

The first dispute among the Green family over control of Champs–Elysees occurred in 1995 when Mark Green set out to increase his ownership interest in the company. Without apprising his family or the other stockholders, Mark Green acquired Champs–Elysees stock from Dominic Lorent, one of the stockholders. Wesley Green, Champs–Elysees's president, resigned his position over this transaction. However, Wesley Green returned to the company several months later after Mark Green tendered the stock he had purchased from Mr. Lorent to the corporate treasury.

Dianne Green took on additional responsibilities at Champs–Elysees during the months that her husband was not with the company. Accordingly, Mark Green and Art Fourier, two other directors and stockholders of the company, increased her annual salary from $57,500 to $90,000. When Wesley Green left Champs–Elysees, his annual salary was $90,000.

After Wesley Green returned as president of Champs–Elysees in October 1995, the company planned to reduce Dianne Green's annual compensation back to $57,500. Dianne Green strenuously objected. She believed that her education, prior experience with the company, and her production of new business justified her $90,000 annual salary. She also objected to rolling back her salary to an amount that was less than the salary the company had agreed to pay a new employee at its British subsidiary.

The officers and directors of Champ–Elysees came up with a novel and "confusing" resolution to Dianne Green's concerns about her compensation. They agreed to combine Wesley Green's $90,000 salary with Dianne Green's $57,500 salary and to pay the combined $147,500 salary to Dianne Green. This salary was to be treated as income to Dianne Green, and Wesley Green would receive no compensation from the company. However, the parties understood that $90,000 of the salary paid to Dianne Green represented compensation for Wesley Green's services.[3] According to Edna Green, the parties understood that if Wesley Green left the company, Dianne Green's salary would be reduced because the $147,500 was "for the two of them together," not just for her services.[4]

At some point, Wesley and Dianne Green decided that Champs–Elysees was paying Dianne Green approximately $10,000 per year less than the salary agreed upon in 1995. By the time Wesley Green brought this matter to the attention of Mark Green[5] and Art Fourier[6] in early

---

3. Wesley Green later conceded that this arrangement would reduce the employment taxes that he and Champs–Elysees would be required to pay and that it would also reduce his Social Security retirement benefits. However, he insisted that tax avoidance was not the reason for structuring his and his wife's compensation in this manner.

4. In fact, following Wesley Green's ouster in 2005, Art Fourier, Champs–Elysees's new president, reduced Dianne Green's final paychecks to include only the portion of the compensation that was attributed to her work.

5. Mark Green was a shareholder and director of Champs–Elysees and also served as the corporation's treasurer.

2004, the underpayments amounted to approximately $90,000. Mark Green suggested that Wesley Green should simply write himself a check for the deficiency or add himself to the company's payroll.[7] Wesley Green did not pursue either of the options suggested by Mark Green.

By this time, Champs–Elysees was experiencing other financial challenges far more serious than the under-payments of Dianne Green's compensation. Dissatisfied customers were cancelling their subscriptions because they were not receiving their audio magazines and materials on time. Customers who desired to renew their subscriptions had no new magazines to purchase. To complicate matters further, the production costs were increasing because of the decline of the Dollar against the Euro. Because of its financial difficulties, the company suspended distributions to its stockholders in February 2004.

The financial challenges facing the company were brought on and exacerbated by the deteriorating relationships between various members of the Green family and by the corporate officers' cavalier bookkeeping practices and attitude about borrowing money from the company on an interest-free basis. Family members became critical of the other family members' motivation and performance. Looking back on the performance of management at that time, Edna Green concluded that "all of my family could've done a better job . . . with the work they did or didn't do."

Wesley Green fired Mr. Fourier in October 2004 because he believed that Mr. Fourier was not performing his job.[8] One of Mr. Fourier's responsibilities had been to maintain Champs–Elysees's checkbook. In November 2004, following Mr. Fourier's departure, Wesley Green began writing company checks made payable either to himself or to "cash," ostensibly to recover the underpayment of his wife's salary. The amounts of these checks ranged between several hundred dollars and one thousand dollars. In the litigation that later ensued, Wesley Green explained that he circumvented Champs–Elysees's payroll management company and decided to "take the money in dribs and drabs rather than in any large chunk or in any regular traunches so as not to put that particular pressure on the company's payroll account." Wesley Green also insisted that he believed that most of the other directors,[9] the company's accountant,[10] and even the company's outside lawyer[11] knew about and approved of his writing and cashing these corporate checks.

Issues of corporate governance continued to fall through the cracks in 2005. In February 2005, the Tennessee Secretary

---

**6.** At the time, Mr. Fourier was a shareholder and director of Champ–Elysees. He became president of the company in 2005.

**7.** For the purposes of the summary judgment motion, Champs–Elysees does not dispute that this conversation occurred.

**8.** Despite his dismissal, Mr. Fourier remained a shareholder and director of the company.

**9.** Wesley Green conceded that his mother, Edna Green, may not have known about the checks. The record is also unclear regarding the extent of Dianne Green's awareness of and reaction to Wesley Green's actions.

**10.** Wesley Green asserts that all of the checks that he wrote to himself were written on the company's payroll account and that they were available to the company's accountant.

**11.** Wesley Green asserts that he told Champs–Elysees's corporate attorney in the summer of 2005 that he was writing checks to himself and that the attorney told him that it was perfectly acceptable to address the under-payment of Dianne Green's salary in that manner.

of State informed Champs–Elysees that it was being administratively dissolved because of failure to file the required annual report. The company reinstated its corporate charter in October 2005. That same month, Wesley and Dianne Green engaged United Services and Trust Corporation ("USTC") to provide advice regarding the steps to be taken to address the company's growing financial and management problems. According to Wesley Green, one of the subjects discussed at the October 2005 meeting with USTC was a $75,000 corporate line of credit with AmSouth Bank. Wesley Green believed that this line of credit had been guaranteed by himself, Mark Green, Edna Green, and Mr. Fourier.

On October 13, 2005, Wesley Green wrote a lengthy letter to USTC's president synopsizing the dire financial straits that Champs–Elysees was in. At the same time, he talked with Edna Green about purchasing her 22,000 shares of the company's stock. Wesley Green told his mother that if he were able to obtain a controlling interest in Champs–Elysees, he would be better able to secure additional investment capital from outside sources to revitalize the company. He discussed the company's precarious financial condition with his mother and told her that the company might be required to file bankruptcy. Edna Green was reluctant to part with her Champs–Elysees stock, but she sensed that Wesley Green was desperate.[12]

Wesley Green and his mother had several more conversations about the sale of her stock. According to Edna Green, Wesley Green stated during these conversations that one of the benefits of the sale of her Champs–Elysees stock would be that she would no longer be secondarily liable to AmSouth Bank for the company's $75,000 line of credit. When Edna Green told her son that she did not believe she was personally liable for the line of credit, Wesley Green told his mother he believed she was.[13] During this period of time, neither Wesley Green nor Edna Green attempted to obtain a definitive answer from AmSouth Bank regarding Edna Green's liability on the line of credit. Based on Wesley Green's statements, Edna Green stated that she "felt" like she might be obligated on the line of credit.[14] She also thought that the shareholders might somehow become liable for corporate debts if Champs–Elysees filed for bankruptcy.

Eventually, on October 24, 2004, Edna Green agreed to sell all her Champs–Elysees stock to her son. After obtaining his mother's agreement, Wesley Green asked his lawyer to finish drafting a bill of sale. On October 27, 2005, Edna Green signed a bill of sale transferring 22,000 shares of Champs–Elysees stock to Wesley Green

**12.** As Edna Green later recalled the conversation, Wesley Green was "talking about bankruptcy if [she] didn't sign it [the contract to sell her stock]." Wesley Green's comments "sounded to [her] like the whole family was going to live under the bridge."

**13.** The current record is ambiguous regarding exactly what Wesley Green said to his mother. Wesley Green testified that during the conversations with his mother, he informed her that he had talked with an officer at AmSouth Bank about the line of credit. He stated that the bank officer told him that the bank's standard policy was to require anyone owning more than a twenty percent interest in a corporation to guarantee loans to the corporation and that stockholders who sold their stake in a corporation would be removed as guarantors on the loan. Wesley Green asserted that he told his mother only what the bank officer had told him and that he never told her that she was personally liable for the line of credit because she was a shareholder of the company.

**14.** It was eventually determined that Edna Green was neither a signatory nor a guarantor of Champs–Elysees's line of credit at AmSouth Bank.

for $8,000. In exchange, Wesley Green gave his mother a $2,000 check as the agreed-upon down payment on the purchase.[15] When combined with the Champs–Elysees shares that he already owned, Wesley Green's acquisition of his mother's 22,000 shares gave him a controlling interest in Champs–Elysees.

Mark Green did not find out that his mother had sold her Champs–Elysees stock to his brother until after Edna Green had signed the bill of sale. He told his mother that there were other ways to save the company that did not require selling her stock or giving Wesley Green a controlling interest in the company. Mark Green told his mother that Mr. Fourier had recently received a significant inheritance and that he might be willing to pay her more for her stock than the amount Wesley Green had agreed to pay her. Following her conversation with Mark Green, Edna Green telephoned Wesley Green to tell him that she was having second thoughts about selling her stock because Mark Green believed that he had been stabbed in the back and because Mr. Fourier might pay more for her stock than Wesley Green had agreed to pay.

On October 28, 2005, Edna Green hand-delivered a letter to Wesley Green rescinding the sale of her stock until further notice. She desired "to find out what else could be worked out that would be in my better interest and everybody's better interest for that matter." Wesley Green refused to rescind the October 27, 2005 bill of sale. According to Edna Green, Wesley Green told her that "what's done is done, you can't rescind this." While Wesley Green denies making this statement, he concedes that he told his mother that he

believed that she could not simply rescind the bill of sale unilaterally.

Thereafter, Edna Green became increasingly optimistic that Mr. Fourier was prepared to infuse additional capital into Champs–Elysees. However, the attorney representing Mr. Fourier made it very clear to Edna Green that his client would not make more funds available to the company unless he obtained control of the corporation. Edna Green understood that accepting Mr. Fourier's conditions would require removing Wesley Green as president of Champs–Elysees and replacing him with Mr. Fourier.

By early November 2005, Edna Green decided to side with Mr. Fourier and not to follow through with the sale of her stock to Wesley Green. She based her decision on her belief that Mr. Fourier was in a better position to raise new capital for the company and that Champs–Elysees required new leadership because Wesley Green was too controlling. In a letter to Wesley Green dated November 2, 2005, Edna Green returned his $2,000 down payment for her stock and stated that "[y]ou should be aware that the proposed transaction is unenforceable and otherwise of no legal effect on the basis that the transaction lacks mutuality, violates the Tennessee Statute of Frauds, and is otherwise legally deficient."

Edna Green, Mark Green and Mr. Fourier met on November 7, 2005. They reviewed Champs–Elysees's financial statement and discussed the company's financial condition and future prospects. During this meeting, Mr. Fourier repeated his disagreement with Wesley Green's decision in February 2004 to suspend dividend payments and stated that he favored resuming these payments, including the

---

**15.** The bill of sale obligated Wesley Green to pay Edna Green $2,000 upon the execution of the bill of sale and then to pay $1,000 at the beginning of every month from January 2006 until the remaining balance had been paid.

payments that had not been made since February 2004. Despite their receipt of Wesley Green's notice that he had purchased Edna Green's stock, Edna Green, Mark Green, and Mr. Fourier decided to hold a meeting of the Champs–Elysees board of directors on November 11, 2005.

During the November 11, 2005 board meeting, Wesley Green insisted that he had purchased Edna Green's stock. However, Edna Green replied that Wesley Green had induced her to sell her stock by representing that she was personally liable on Champs–Elysees's line of credit at Am-South Bank and that she would be relieved of this liability by selling her shares to him. Mr. Fourier's attorney informed Wesley Green that Edna Green's Champs–Elysees stock would not be transferred to him without an order of a court directing her to do so. Wesley Green left the meeting, leaving his attorney with his proxy.

As a result of this meeting, the balance of power shifted at Champs–Elysees. Wesley Green was removed as a director and officer of the corporation

> pursuant to Bylaw 3.10 for cause for conduct prejudicial to the interest of the corporation including but not limited to: taking actions as President without authorization of the Board of Directors; failing to call annual or special meetings of directors or shareholders meetings for at least two years; allowing the financial situation of the corporation to decline severely while extending himself advances from the corporation which remain unpaid totaling $34,821.00 as of June 20, 2005 of which $29,675.00 was taken during the fiscal year ending June 30, 2005 without notice to other directors or shareholders and without Board of Director authorization; failing to issue in excess of 25 issues of the product to customers who have paid for these issues in advance totaling

$4,694,639.60 as of June 30, 2005, resulting in serious loss of subscribers and decline in income and net worth of the corporation; and exhausting cash of the corporation.

The remaining shareholders determined that the company would henceforth have a three-member board of directors consisting of Edna Green, Mark Green, and Mr. Fourier. The shareholders elected Mr. Fourier as the president and treasurer of the corporation and Mark Green as the secretary.

## II.

### THE PROCEEDINGS IN THE CHANCERY COURT

Litigation quickly followed. On November 14, 2005, Wesley Green filed suit in the Chancery Court for Davidson County seeking declaratory and injunctive relief against Edna Green, Mark Green, and Mr. Fourier. Wesley Green also sought temporary restraining orders to prevent the sale or transfer of any of Champs–Elysees's stock. On November 15, 2005, he filed a complaint in the Circuit Court for Davidson County against these same defendants and Champs–Elysees, seeking damages for tortious interference with a business contract.

The chancery court conducted a hearing on November 22, 2005 on Wesley Green's request for temporary restraining orders. In its oral findings at the conclusion of the hearing, the court determined that "[o]n the face of this I find [the October 27, 2005 bill of sale] to be an unenforceable document. This document could not be presented to any lender as evidence of ownership in this stock." In addition, the chancery court also determined that "there is a basis to find that there is an adequate remedy at law" and that it was unlikely that Wesley Green would prevail on the merits "because I find it to be an unenforceable document." The court also

determined that the October 27, 2005 bill of sale was unconscionable and the product of a mutual mistake. Accordingly, the court declined to grant the injunction as to Edna Green. As for a temporary restraining order regarding the sale of treasury stock, the court concluded that this matter was not within the parameters of Wesley Green's declaratory judgment action and thus was not appropriately before the court for purposes of a temporary restraining order.

On November 29, 2005, Wesley Green voluntarily nonsuited his claims against Mr. Fourier and Mark Green in the chancery court proceeding. In a written order handed down on December 1, 2005, the chancery court declined to enjoin Edna Green from transferring her Champs–Elysees stock for the following three reasons: (1) the October 27, 2005 bill of sale was invalid on its face; (2) Wesley Green had an adequate remedy at law; and (3) Wesley Green had failed to demonstrate a substantial likelihood of success on the merits.[16] The court also declined to enjoin Edna Green, Mike Green, and Mr. Fourier from issuing or selling any treasury stock because Wesley Green had not requested any relief with regard to this stock in his declaratory judgment complaint.[17]

In a second order entered on December 1, 2005, the chancery court directed the parties to participate in mediation which, not surprisingly, proved to be unsuccessful. On February 9, 2006, Champs–Elysees moved to intervene in the pending chancery court proceedings to assert a claim against Wesley Green for $50,000 and punitive damages based on allegations

that he had misappropriated corporate funds. On March 9, 2006, over Wesley Green's objections, the court granted Champs–Elysees's motion.

On April 10, 2006, Wesley Green filed his answer to Champs–Elysees's complaint. He asserted that the funds alleged to have been misappropriated had actually been paid with the consent and approval of Mark Green, Mr. Fourier, Champs–Elysees's outside counsel, and Mr. Fourier's counsel. He also asserted the affirmative defenses of estoppel, waiver, and license. Wesley Green also filed a counterclaim raising eleven claims against Edna Green, Mark Green, Mr. Fourier, and Champs–Elysees ("Champs–Elysees defendants"). On May 16, 2006, the chancery court entered an order granting the Champs–Elysees defendants' motion to dismiss Wesley Green's counterclaim.

On May 11, 2006, Edna Green and Champs–Elysees moved for a summary judgment on Edna Green's counterclaim for rescission under Tenn.Code Ann. § 48–2–122(b)(1) and Champs–Elysees's claim against Wesley Green for misappropriation of corporate funds. On July 21, 2006, the chancery court filed an order granting these motions. With regard to the summary judgment for Edna Green, the court pointed out that the undisputed facts showed (1) that Edna Green owned the disputed shares of Champs–Elysees stock, (2) that Wesley Green had violated Tenn. Code Ann. § 48–2–121(a)(2) (2002) in the purchase of his mother's Champs–Elysees stock, and (3) that Edna Green was entitled to rescind the bill of sale under Tenn. Code Ann. § 48–2–122(b)(1) (Supp.2008).

16. With regard to the conclusion that Wesley Green's claims did not have a substantial likelihood of success, the chancery court stated "[n]ot only is the 'Bill of Sale' upon which plaintiff relies unenforceable on its face, but its terms are unconscionable and, in certain respects, are the product of a mutual mistake of fact."

17. Later, on February 21, 2006, the chancery court denied Wesley Green's motion to alter or amend its December 1, 2005 order.

The chancery court explained that its conclusion that Wesley Green had violated Tenn.Code Ann. § 48–2–121(a)(2) was based on (1) Wesley Green's representation to Edna Green that she was a guarantor of Champs–Elysees's line of credit at AmSouth Bank; (2) the undisputed fact that this representation was not true; (3) the undisputed fact that this representation was made in connection with the sale of stock; and (4) that, viewed objectively, this representation was material to the transaction. The court also stated that Wesley Green's lack of intent to defraud Edna Green and the dispute over whether Edna Green relied on Wesley Green's representation were not material with regard to Edna Green's rescission claim.

The chancery court also granted summary judgment to Champs–Elysees on its claim that Wesley Green had misappropriated $46,600 in corporate funds. The court reasoned (1) that it was undisputed that Wesley Green had written $46,600 in checks to himself, (2) that the unpaid salary belonged to Dianne Green not him, and (3) that Wesley Green "was without any authority to appropriate Company funds to himself to satisfy an obligation which the Company is alleged to have had to Mrs. Dianne Green."

On August 21, 2006, Wesley Green filed a motion to alter or amend the July 21, 2006 summary judgment and a motion for leave to file a thirteen-claim amended complaint against the Champs–Elysees defendants. The chancery court heard the motions on September 15, 2006, and entered an order on September 22, 2006 denying both motions. Wesley Green appealed to the Court of Appeals.

The Court of Appeals filed its opinion on March 5, 2008. *Green v. Green*, No. M2006–02119–COA–R3–CV, 2008 WL 624860 (Tenn.Ct.App. Mar.5, 2008). The court affirmed the chancery court's deci-sion to permit Champs–Elysees to intervene in the proceeding and to assert a claim for misappropriation of corporate funds against Wesley Green. The court also affirmed the chancery court's orders denying Wesley Green's motions for recusal and temporary injunctive relief and granting Edna Green's motion for protective limitations on her depositions.

However, the Court of Appeals also determined that the chancery court had erred by granting the summary judgments in favor of Edna Green's claim for rescission under Tenn.Code Ann. § 48–2–122(b)(1) and in favor of Champs–Elysees's misappropriation claim. The court also concluded that the trial court had erred by dismissing Wesley Green's counter-complaint and by denying his later motion to file an amended complaint. The Court of Appeals based its decision regarding Edna Green's rescission claim chiefly on its conclusion that rescission claims under Tenn. Code Ann. § 48–2–122(b)(1) required the claimant to prove reliance on the defendant's representations. The court based its decision regarding Champs–Elysees's misappropriation claim on its conclusion that genuine disputes of material fact prevented the granting of a summary judgment.

On May 5, 2008, Champs–Elysees and Edna Green filed a Tenn. R.App. P. 11 application for permission to appeal, asserting that the Court of Appeals erred (1) by reversing the summary judgment for Edna Green on her claim for rescission under Tenn.Code Ann. § 48–2–122(b)(1) disposing of Wesley Green's claim against Edna Green, (2) by reversing the summary judgment for Champs–Elysees on its claim against Wesley Green for misappropriation of funds, and (3) by concluding that the chancery court erred by denying Wesley Green's motion to amend his complaint. Wesley Green has not taken issue with any

of the issues decided adversely to him by the Court of Appeals. Although on grounds partially different from those relied on by the Court of Appeals, we affirm the conclusion of the Court of Appeals that the chancery court erred by awarding summary judgments to Edna Green. We also affirm the Court of Appeals' conclusion that the chancery court erred by awarding summary judgment to Champs–Elysees and by denying Wesley Green permission to file an amended complaint.

The principal focus of this appeal is on Edna Green's claim for rescission of the October 27, 2005 bill of sale in which she agreed to sell her Champs–Elysees stock to Wesley Green. Edna Green insists that the Court of Appeals erred by construing Tenn.Code Ann. § 48–2–122(b)(1) to require sellers seeking rescission of a contract to sell securities to prove that they had relied on the purchaser's misrepresentations regarding the sale. For his part, Wesley Green asserts that reliance is an essential element of a rescission claim under Tenn.Code Ann. § 48–2–122(b)(1). He also asserts (1) that his representations regarding his mother's liability for the Am-South Bank line of credit were true; (2) that, if these representations were not true, his mother knew that they were not true; (3) that his statements regarding the AmSouth Bank line of credit were not material to the transaction; and (4) that Tenn.Code Ann. § 48–2–122(b)(1) does not

apply to the transaction because it involves the sale of a partnership interest rather than a security.

## III.

### THE TENNESSEE SECURITIES ACT OF 1980

Laws regulating securities and transactions involving securities can be traced back to 1285 during the reign of Edward I. Robert F. Miller, *Procedures Under the Tennessee Securities Laws*, 28 Tenn. L.Rev. 303, 303 (1961) ("Miller"). The modern state laws regulating securities and transactions in securities originated in 1911 when Kansas enacted the first of what is now commonly referred to as "blue sky laws." [18] James M. Bartos, *United States Securities Law: A Practical Guide* § 3.7.1, at 120 (2006); 2 Jerry W. Markham, *A Financial History of the United States* 59 (2002). Tennessee's first blue sky law was enacted in 1913.[19] Every state has now enacted a blue sky law.[20]

The Tennessee General Assembly replaced virtually all of the 1913 blue sky law when it enacted the Securities Act of 1955.[21] The 1955 blue sky law was a modified version of a uniform law promulgated in 1951 by the Investment Bankers Association of America. Miller, 28 Tenn. L.Rev. at 304. It preceded by one year the adoption by the National Conference of Commissioners on Uniform State Laws of its first Uniform Securities Act in 1956.[22]

---

18. The term "blue sky law" originated to describe state legislation aimed at speculative investment schemes that had "no more basis than so many feet of 'blue sky.'" *Hall v. Geiger–Jones Co.*, 242 U.S. 539, 550, 37 S.Ct. 217, 61 L.Ed. 480 (1917).

19. Act of Sept. 27, 1913, ch. 31, 1913 Tenn. Pub. Acts 500 (codified as amended at Tenn. Code Ann. §§ 45–1901, –1916 (1955)); Miller, 28 Tenn. L.Rev. at 304.

20. 2 Thomas L. Hazen, *Treatise on the Law of Securities Regulation* § 8.1[1][A], at 420 (6th ed. 2009) ("Hazen").

21. Act of Mar. 2, 1955, ch. 143, 1955 Tenn. Pub. Acts 521 (codified at Tenn.Code Ann. §§ 48–1601, –1648 (Supp.1957)).

22. *See* Uniform Securities Act (1956 amended 1958), 7C U.L.A. Appendix I 746 (2006) ("1956 Uniform Securities Act").

The language of Section 101 of the 1956 Uniform Securities Act defining the practices prohibited by the Act was drawn largely from Securities and Exchange Commission Rule 10b–5,[23] which, in turn, was based on Section 17(a) of the Securities Act of 1933.[24] However, Section 101 differed from Section 17(a) and Rule 10b–5 in one significant respect—it covered the purchase as well as the sale of any security. 1956 Uniform Securities Act § 101 cmt., 7C U.L.A. 749.

The General Assembly modernized Tennessee's blue sky law again when it enacted the Tennessee Securities Act of 1980.[25] In doing so, the General Assembly declared that the law should "be so construed to effectuate its general purpose to protect investors, to coordinate the interpretation and administration of this Act with related federal and state regulation, and to require full and fair disclosure in all securities transactions." Act of Apr. 16, 1980, ch. 866, § 25, 1980 Tenn. Pub. Acts 1170, 1228. The Tennessee Securities Act of 1980 contains many of the provisions found in the Securities Law of 1955. Its sections defining the violations of the statute contain language similar to the 1956, 1985, and 2002 versions of the Uniform Securities Act, as well as Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934,[26] and Rule 10b–5.

Both parties have undertaken to link the private rights of action in Tenn. Code Ann. § 48–2–122 either to the federal Securities Act of 1933 or to the federal Securities Exchange Act of 1934 and its implementing regulation, Rule 10b–5. The purpose of these efforts is clear. Edna Green desires to link Tenn.Code Ann. § 48–2–122 to the Securities Act of 1933 because persons pursuing private claims under this Act, to the extent that private claims are permitted, are not required to prove that they relied on the defendant's representation or omission.[27] On the other hand, Wesley Green asserts that Tenn. Code Ann. § 48–2–122 should be equated to the federal Securities Exchange Act of 1934 and Rule 10b–5 because the judicially created private rights of action under these provisions require the plaintiff to prove reliance on the defendant's representation or omission.[28]

23. 17 C.F.R. § 240.10b–5 (2009).

24. 15 U.S.C.A. § 77q(a) (West Supp.2009).

25. Act of Apr. 16, 1980, ch. 866, 1980 Tenn. Pub. Acts 1170 (codified as amended at Tenn. Code Ann. §§ 48–2–101, –126 (2002 & Supp. 2008)).

26. 15 U.S.C.A. § 78j(b) (West Supp.2009).

27. Purchasers pursuing a private right of action under Section 12(a)(2) of the Securities Act of 1933 [15 U.S.C.A. § 77*l* (West Supp. 2009)] are not required to prove reliance. *Gustafson v. Alloyd Co.*, 513 U.S. 561, 576, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The great weight of current authority is that there is no implied private right of action for violations of Section 17(a). *Compare Zink v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 13 F.3d 330, 334 (10th Cir.1993) (declining to recognize a private right of action under Section 17(a)); *Finkel v. Stratton Corp.*, 962 F.2d 169, 174–75 (2d Cir.1992) (declining to recognize a private right of action under Section 17(a)), *with Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 492 (6th Cir.1990) (recognizing a private right of action under Section 17(a)); *but see Vennittilli v. Primerica, Inc.*, 943 F.Supp. 793, 800 (E.D.Mich.1996) (noting that the United States Court of Appeals for the Sixth Circuit may have changed its position in *Burns v. Price Waterhouse*, 48 F.3d 1219 (Table), 1995 WL 106116, at *1 (6th Cir.1995) in which it affirmed a District Court's dismissal of a private Section 17(a) claim on the ground that Section 17(a) claims were not permitted).

28. Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 do not expressly provide for private rights of action. However, the United States Supreme Court has found an implied right of action in the words of the statute and the rule. *Superintendent of*

As interesting as these arguments are, they are not the proper beginning point for construing either Tenn.Code Ann. § 48–2–121 or Tenn.Code Ann. § 48–2–122. We must begin with the words of the state statutes. *Waldschmidt v. Reassure Am. Life Ins. Co.,* 271 S.W.3d 173, 176 (Tenn.2008). Our goal is to ascertain and to give the fullest possible effect to the General Assembly's intent and purpose. *Auto Credit of Nashville v. Wimmer,* 231 S.W.3d 896, 900 (Tenn.2007); *State ex rel. Pope v. U.S. Fire Ins. Co.,* 145 S.W.3d 529, 534–35 (Tenn.2004). We must (1) give these words their natural and ordinary meaning, (2) consider them in the context of the entire statute, and (3) presume that the General Assembly intended that each word be given full effect. *Lanier v. Rains,* 229 S.W.3d 656, 661 (Tenn.2007); *State v. Flemming,* 19 S.W.3d 195, 197 (Tenn.2000). When a statute's language is clear and unambiguous, we need not look beyond the statute itself, *State v. Strode,* 232 S.W.3d 1, 9–10 (Tenn.2007); *Corum v. Holston Health & Rehab. Ctr.,* 104 S.W.3d 451, 454 (Tenn.2003), but rather, we must simply enforce it as written. *Wausau Ins. Co. v. Dorsett,* 172 S.W.3d 538, 543 (Tenn. 2005); *Miller v. Childress,* 21 Tenn. (2 Hum.) 320, 321–22 (1841).

## IV.

### THE ELEMENT OF RELIANCE IN TENN.CODE ANN. § 48–2–122(B)(1) CLAIMS

We turn first to the question of whether the right of action for rescission in Tenn. Code Ann. § 48–2–122(b)(1) requires the plaintiff to prove reliance on the representations or omissions of the defendant. Tenn.Code Ann. § 48–2–122(b)(1) provides that the purchaser of a security will be required to return the security under the following circumstances: (1) the seller returns the consideration received, (2) the seller proves that the purchaser violated Tenn.Code Ann. § 48–2–121(a),[29] (3) the seller proves that he or she did not know of the purchaser's violation of Tenn.Code Ann. § 48–2–121(a) at the time of the sale, and (4) the purchaser fails to prove that it did not know and in the exercise of reasonable care could not have known of the violations of Tenn.Code Ann. § 48–2–122(a).

Tenn.Code Ann. § 48–2–122(b)(1) expressly addresses the mental state of the seller with regard to the purchaser's representations or omissions in the transaction. To be entitled to rescission, the seller must "not know[ ] of the violation of

*Ins. of N.Y. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). This implied right of action resembles, but is not identical to, common-law tort actions for deceit and misrepresentation. *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Private parties pursuing these claims must prove reliance on the defendant's representation or omission. *Stoneridge Inv. Partners LLC v. Scientific–Atlanta,* 552 U.S. 148, ——, 128 S.Ct. 761, 768, 169 L.Ed.2d 627 (2008).

29.  Tenn.Code Ann. § 48–2–121(a) provides:
     It is unlawful for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly, to:

(1) Employ any device, scheme, or artifice to defraud;
(2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or
(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit on any person.
The language in Tenn.Code Ann. § 48–2–121(a)(2), is similar to Tenn.Code Ann. § 48–1644(A), 1956 Uniform Securities Act § 101, 1985 Uniform Securities Act § 501(2), 2002 Uniform Securities Act 501(2), Section 17(a) of the Securities Act of 1933, and Rule 10b–5.

§ 48–2–121(a)." Thus, if the seller knows that the purchaser's representations are untrue, the seller may not rescind the sale. However, nowhere in the plain language of Tenn.Code Ann. § 48–2–122(b)(1) or in Tenn.Code Ann. § 48–2–121(a) does the requirement of reliance by the seller on the purchaser's representation or omission appear.

The Court of Appeals' decision in this case finds support in *Constantine v. Miller Indus., Inc.,* 33 S.W.3d 809 (Tenn.Ct.App. 2000) and *Diversified Equities, Inc. v. Warren,* 567 S.W.2d 171 (Tenn.Ct.App. 1976), *overruled on other grounds by V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.,* 595 S.W.2d 474 (Tenn.1980). The parties in those cases, like the parties in this case, sought to convince the Court of Appeals that the elements of claims under Tenn.Code Ann. § 48–2–122 were similar to either the private claims under the Securities Act of 1933 or the private claims under the Securities Exchange Act of 1934 and Rule 10b–5. Both courts accordingly focused their analysis on the textual similarities and dissimilarities of Tenn.Code Ann. § 48–2–122 with the federal securities law without first looking to the language of Tenn.Code Ann. § 48–2–122 itself. By doing so, the courts lost sight of the fact that the Tennessee General Assembly had already included the elements of the statutory claims in Tenn.Code Ann. § 48–2–122 and, thus, that they did not need to look to federal law or the common law for guidance.

■■■ Because neither Tenn.Code Ann. § 48–2–121(a) nor Tenn.Code Ann. § 48–2–122(b) require reliance as an element of the right of action, we find no basis for engrafting such a requirement onto Tenn. Code Ann. § 48–2–122(b)(1). When the

language of a statute is clear and unambiguous, we should adopt the statute's plain meaning in its normal and accepted use. *Eastman Chem. Co. v. Johnson,* 151 S.W.3d 503, 507 (Tenn.2004). As Justice William Reese observed almost one hundred and seventy years ago, "[w]here a statute is plain and explicit in its meaning and its enactment withing the legislative competency, the duty of the courts is simple and obvious, namely, to say *sic lex scripta,*[30] and obey it." *Miller v. Childress,* 21 Tenn. (2 Hum.) at 321–22. Accordingly, *Constantine v. Miller Indus., Inc.* and *Diversified Equities, Inc. v. Warren,* to the extent that they are inconsistent with our holding in this case, should no longer be followed.

■■ When Tenn.Code Ann. § 48–2–122(b)(1) is considered in the context of the entire statute, it is clear that the General Assembly is familiar with the role that reliance can play in private rights of action arising out of securities transactions. In Tenn.Code Ann. § 48–2–122(d), the General Assembly explicitly included reliance as an element of the private right of action against investment advisors for false or misleading statements. By including reliance as an element of the right of action in Tenn.Code Ann. § 48–2–122(d) but not of the right of action under Tenn.Code Ann. § 48–2–122(b)(1), the General Assembly clearly stated its choice with regard to the elements of complaints based on misrepresentations or omissions that come under Tenn.Code Ann. § 48–2–122(b)(1). It decided that reliance should not be an element of the right of action under Tenn. Code Ann. § 48–2–122(b)(1). While our decision today does not prevent the General Assembly from making reliance a neces-

---

**30.** The phrase "sic lex scripta" is translated as "so is the law written." *Fed. Express Corp.* *v. Woods,* 569 S.W.2d 408, 411 (Tenn.1978).

sary element of rights of action under Tenn.Code Ann. § 48–2–122(b)(1), we have no basis to engraft the element of reliance onto rights of action under Tenn.Code Ann. § 48–2–122(b)(1) by judicial fiat.

While our decision in this case rests squarely on the plain language of Tenn. Code Ann. § 48–2–122(b)(1) and Tenn. Code Ann. § 48–2–121(a), we are mindful of our obligation to interpret these statutes in a way that "coordinate[s] the interpretation and administration of this Act with related federal and state regulation."[31] Our research has not revealed any inconsistency between permitting sellers of securities in Tennessee to use state law to rescind the transactions based on fraud, deceit, or misrepresentation by the purchaser without proof of reliance, even though similarly situated parties would be required to prove reliance if they were pursuing a federal claim in a United States District Court.[32]

We also note that our interpretation of Tenn.Code Ann. § 48–2–122(b)(1) and Tenn.Code Ann. § 48–2–121(a) is consistent with the prevailing interpretation of similar provisions in other states' blue sky laws. The drafter of the 1956 Uniform Securities Act has explained that "civil liability is an essential adjunct to a blue sky law."[33] He has also pointed out that the civil liabilities provision of the Act requires only that the plaintiff prove that he or she did not know that a representation was untrue and that it does not require proof of reliance.[34] The overwhelming weight of authority in states with statutes similar to Tenn.Code Ann. § 48–2–121(a) and Tenn. Code Ann. § 48–2–122(b)(1) is that reliance is not an element of a right of action for false and misleading statements in a securities transaction.[35] Currently, only two states other than Tennessee require proof of reliance in claims of this sort.[36] This prevailing view is also reflected in the civil remedies provision in the 2002 Uniform Securities Act.[37]

Finally, we note that we are also obliged to interpret the Tennessee Securities Act of 1980 in a way that "require[s] full and fair disclosure in all securities transac-

---

**31.** Act of Apr. 16, 1980, ch. 866, § 25, 1980 Tenn. Pub. Acts 1170, 1228.

**32.** The federal securities acts expressly permit concurrent state regulation of securities and securities transactions under blue sky laws. 15 U.S.C.A. §§ 77r, 78bb (West 1997 & Supp. 2009). While the National Securities Markets Improvement Act of 1996 [Pub. Law No. 104–290, 110 Stat. 3416 (codified in scattered sections of 15 U.S.C.)] now preempts certain regulatory provisions in state blue sky laws, it does not preempt state law actions for false and misleading statements. However, the Securities Litigation Uniform Standards Act of 1998 [15 U.S.C.A. §§ 77p(b)-(f) and 78bb(f) (West Supp.2009)] does preempt certain state securities fraud claims involving publicly traded securities. Hazen, § 8.1[2], at 431. Wesley Green has not argued that the claims against him based on Tenn.Code Ann. § 48–2–122(b)(1) are preempted, and, based on the facts in this record, we have no basis to conclude that they are.

**33.** Louis Loss, *Commentary on the Uniform Securities Act* 146 (1976) ("Loss").

**34.** Loss, at 146.

**35.** 12 A Joseph C. Long, *Blue Sky Law* §§ 9:117.13 & 9:117.19 n.5 (2009) ("Long"); *see also* Joel Seligman, *The New Uniform Securities Act*, 81 Wash. U.L.Q. 243, 288 (2003) ("Seligman"); David O. Blood, Comment, *There Should be No Reliance in the "Blue Sky,"* 1998 B.Y.U.L. Rev. 177, 194 n. 95.

**36.** The other two states are Georgia and Washington. Long, §§ 9:117.21 & 9:117.29.

**37.** Uniform Securities Act § 509 cmt. 4 (2002), 7C U.L.A. 166 (2006) (noting that "neither causation nor reliance has been held to be an element of a private cause of action under the precursor to Section 509(b)"); Seligman, 81 Wash. U. L.Q. at 288.

tions."[38] The construction of Tenn.Code Ann. § 48–2–122(b)(1) and Tenn.Code Ann. § 48–2–121(a) that we adopt today will certainly prompt full and fair disclosures in securities transactions.

## V.

### THE REQUIREMENT OF MATERIALITY IN TENN.CODE ANN. § 48–2–122(B)(1) CLAIMS

■ Tenn.Code Ann. § 48–2–121(a)(2) proscribes making "any untrue statement of a material fact or omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." Accordingly, the element of materiality comes into play in actions under Tenn.Code Ann. § 48–2–122(b)(1) when the claim is based on a violation of Tenn.Code Ann. § 48–2–121(a)(2). This appeal prompts the consideration of two aspects of materiality. The first question is whether the test for materiality is an objective or subjective one. The second question is whether materiality requires that the plaintiff "would" or merely "might" have considered the statement or omission to be important in making an investment-related decision.

In the context of common-law misrepresentation claims, the test for the materiality of a statement or omission is an objective one. As one authoritative treatise points out:

> There are misstatements which are so trivial, or so far unrelated to anything of real importance in the transaction, that the plaintiff will not be heard to say that they substantially affected his [or her]

decision. Necessarily the test must be an objective one, and it cannot be stated in the form of any definite rule, but must depend upon the circumstances of the transaction.

W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 108, at 753 (5th ed. 1984) ("Prosser & Keeton"). Accordingly, "matters entirely collateral to a contract, and apparently of no significance to any reasonable [person] under the circumstances, have been held to be immaterial . . . ." Prosser & Keeton, at § 108, at 753. Alternatively, "facts to which a reasonable [person] might be expected to attach importance in making his [or her] choice of action . . . have been held to be material." Prosser & Keeton, at § 108, at 753–54. While common-law misrepresentation has certain variances from statutorily created securities provisions that address misrepresentation in that context, there is a resemblance between the common-law structure for assessing materiality of a misrepresentation and the approach that exists with regard to defining materiality under Tenn.Code Ann. § 48–2–121(a)(2).

Courts and commentators have often confused, intermingled, or conflated the closely related concepts of materiality and reliance.[39] In the context of securities law, "material information" has been defined as "[i]nformation that would be important to a reasonable investor in making an investment decision." Black's Law Dictionary 998 (8th ed. 2004) ("Black's Law Dictionary"). Alternatively, "reliance" has been defined as "[d]ependence or trust by a person, esp. when combined with action based on that dependence or trust."

38. Act of Apr. 16, 1980, ch. 866, § 25, 1980 Tenn. Pub. Acts 1170, 1228.

39. Arnold S. Jacobs, 5C *Disclosure & Remedies Under the Sec. Laws* § 12:29 (2009); Roberta S. Karmel, *When Should Investor Reliance Be Presumed in Securities Class Actions?*, 63 Bus. Law. 25, 32–33 (2007); E.C. Lashbrooke, Jr., *The Alternative–Action Requirement: The Derailment of Santa Fe*, 1981 Duke L.J. 963, 976 (1981).

Black's Law Dictionary 1316. "Materiality is the objective test of causation; material information is information that would have been a substantial factor in the decision of a reasonable [person]." Harold S. Bloomenthal & Samuel Wolff, 3B *Securities and Federal Corporate Law* § 13:25 (2d ed. 2009) ("Bloomenthal and Wolff"). On the other hand, reliance "is directed toward the impact of the allegedly false or misleading information on the specific plaintiff—if applicable, the representation must have 'been a substantial factor in bringing about [the plaintiff's] action.'" Bloomenthal and Wolff, at § 13:25.

In other words, "[t]he test of reliance is whether the misrepresentation is a substantial factor in the plaintiff's investment decision.... The basic test of materiality ... is whether an average reasonable person would attach importance to the misinformation in determining his choice of action in the transaction in question." 17 J. William Hicks, *Civil Liabilities: Enforcement & Litig.* § 6:119 (2009) ("Hicks").[40] Professor Louis Loss has observed that "to be sure, some element of reliance (which is subjective) is inherent in the concept of materiality (which is an objective 'reasonably prudent person' concept). But ... that element should not be permitted to come in the back door by way of a definition of materiality." 9 Louis Loss & Joel Seligman, *Securities Regulation* 4203 (3d ed. 1989). Because a court's focus in assessing materiality should be attuned squarely to the objective test, "a court will draw the wrong inference from the accepted definition of materiality if it expands its focus to consider whether the defective communication influenced a par-

ticular ... plaintiff." Hicks, at § 6:119. Properly understood, the test of materiality "is concerned with the ordinary or average reasonable investor—one without the attributes or motivations of the specific plaintiff," Hicks, at § 6:119 n. 9, and simply does not depend upon the response of the individual buyer or seller to the misrepresentation. Hicks, at § 6:135.

In the seminal securities case of *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the United States Supreme Court indicated that "[t]he question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." Courts interpreting similar language under state blue sky laws have also determined that the question of whether a particular statement is material presents an objective rather than a subjective inquiry. *See, e.g., Lane v. Midwest Bancshares Corp.,* 337 F.Supp. 1200, 1208 (E.D.Ark.1972); *Trimble v. Am. Sav. Life Ins. Co.,* 152 Ariz. 548, 733 P.2d 1131, 1136 (Ariz.Ct.App.1986); *Lehn v. Dailey,* 77 Conn.App. 621, 825 A.2d 140, 145 (2003); *Carroll v. J.J.B. Hilliard, W.L. Lyons, Inc.,* 738 N.E.2d 1069, 1077 (Ind.Ct.App. 2000); *Loewen v. Galligan,* 130 Or.App. 222, 882 P.2d 104, 119 (1994); *Gohler v. Wood,* 919 P.2d 561, 564 n. 3 (Utah 1996); *Cuene v. Hilliard,* 312 Wis.2d 506, 754 N.W.2d 509, 514 (Wis.Ct.App.2008). Today, we align Tennessee with the states that use an objective test to determine whether a particular representation or omission is material.

---

**40.** *See, e.g., Nathenson v. Zonagen Inc.,* 267 F.3d 400, 413 (5th Cir.2001) (reaffirming that "[t]he element of reliance is the subjective counterpart to the objective element of materiality. Whereas materiality requires the plaintiff to demonstrate how a 'reasonable'

investor would have viewed the defendants' statements and omissions, reliance requires a plaintiff to prove that it *actually* based its decisions upon the defendants' misstatements or omissions.").

The second question regarding the concept of materiality in the context of securities laws involves whether a finding of materiality requires that "the purchaser or seller 'would,' or merely 'might' consider the misstatement or omission as being important in making his investment decision." Long, at § 10:44. Proponents of the competing approaches variously decried the "would influence" standard as setting the threshold for materiality too high, and the "might influence" standard as setting the threshold too low. Long, at § 10:44. For purposes of federal law claims involving proxy disclosures, the United States Supreme Court provided a settlement between these factions by defining the standard for materiality as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote .... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

TSC Indus., Inc. v. Northway, Inc., 426 U.S. at 449, 96 S.Ct. 2126. The Court's "substantial likelihood" standard established the threshold between the "might" and "would" standards, and reduced the height of the "would" standard by providing a sufficient showing could be made based on a substantial likelihood.

The impact of the United States Supreme Court's ruling setting the standard for materiality has extended far beyond proxy disclosure suits. "[S]tate courts and securities agencies have generally followed the lead of TSC Industries in private civil litigation, agency enforcement actions, and administrative proceedings as well as in criminal cases." Long, at § 10.44. Modified for application to the purchase or sale of a security, the test provides:

> A misstatement of omitted fact is material if there is a substantial likelihood that a reasonable purchaser or seller would consider it important in deciding whether or not to purchase or sell. It does not require proof of a substantial likelihood that disclosure of the misstatement or omitted fact would have caused the reasonable investor not to purchase or sell the security. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the misstatement or omitted fact would have assumed actual significance in the deliberations of the reasonable investor. Put another way, there must be a substantial likelihood that the disclosure of the misstatement or omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

Long, at § 10.44; see also, e.g., Rose v. Dobras, 128 Ariz. 209, 624 P.2d 887, 892 (Ariz.Ct.App.1981); Goss v. Clutch Exch., Inc., 701 P.2d 33, 36 (Colo.1985); Carroll v. J.J.B. Hilliard, W.L. Lyons, Inc., 738 N.E.2d at 1077; State v. Puckett, 6 Kan. App.2d 688, 634 P.2d 144, 149 (1981); Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 809 N.E.2d 1017, 1030 (2004); Bridwell v. State, —— S.W.3d ——, ——, 2008 WL 467271, at *5 (Tex.Ct.App. 2008). We likewise join the jurisdictions that employ the "substantial likelihood"

standard for determining the materiality of a representation or omission.

## VI.

### THE SUMMARY JUDGMENT ON EDNA GREEN'S TENN.CODE ANN. § 48–2–122(B)(1) CLAIM

■ We now turn to the question of whether Edna Green is entitled to a summary judgment on her Tenn.Code Ann. § 48–2–122(b)(1) claim against Wesley Green. She insists that the Court of Appeals erred by engrafting the element of reliance on Tenn.Code Ann. § 48–2–122(b)(1). Edna Green also insists that she is otherwise entitled to a summary judgment because she has demonstrated that there are no genuine disputes as to any of the facts material to her claim and that she is entitled to rescission as a matter of law. For his part, Wesley Green asserts (1) that his statements to his mother regarding her exposure on the AmSouth Bank line of credit were true, (2) that any statements he may have made to his mother regarding the AmSouth Bank line of credit were not material to her decision to sell him her Champs–Elysees stock, (3) that his mother knew the truth about her obligation, if any, on the AmSouth Bank line of credit when he made his statements about her obligation,[41] and (4) that his mother's sale of the Champs–Elysees stock could not have violated Tenn.Code Ann. § 48–2–122(b)(1) as a matter of law because it involved the sale of a partnership interest rather than a sale of stock.[41]

### A.

■ Summary judgments are not disfavored procedural devices. *Eskin v. Bartee*, 262 S.W.3d 727, 732 (Tenn.2008); *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn.

1997). They are proper in virtually any civil case that can be resolved on legal issues alone. *Eskin v. Bartee*, 262 S.W.3d at 732; *Lawrence County Educ. Ass'n v. Lawrence County Bd. of Educ.*, 244 S.W.3d 302, 309 (Tenn.2007). Thus, trial courts should grant properly made and supported summary judgment motions when the undisputed facts, as well as the inferences reasonably drawn from the undisputed facts, support only one conclusion—that the moving party is entitled to a judgment as a matter of law. *Griffis v. Davidson County Metro. Gov't*, 164 S.W.3d 267, 283–84 (Tenn.2005); *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn.2002).

■ The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law. *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn.2008). For facts to be considered at the summary judgment stage, they must be included in the record, Tenn. R. Civ. P. 56.03, and they must be admissible in evidence. *Byrd v. Hall*, 847 S.W.2d 208, 215–16 (Tenn.1993); Tenn. R. Civ. P. 56.06. When ascertaining whether a genuine dispute of material fact exists in a particular case, the courts must focus on (1) whether the evidence establishing the facts is admissible, (2) whether a factual dispute actually exists, and, if a factual dispute exists, (3) whether the factual dispute is material to the grounds of the summary judgment.

■ Summary judgments are not permitted when a case's determinative

41. Wesley Green did not raise this matter in either the trial court or the Court of Appeals. Accordingly, he has waived it, and we will not

consider it here. *See Dye v. Witco Corp.*, 216 S.W.3d 317, 321 (Tenn.2007); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn.1983).

facts are in dispute. Accordingly, assuming that the facts are found in the record and that they would be admissible, the second inquiry is whether a factual dispute actually exists. If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists. *Martin v. Norfolk S. Ry.*, 271 S.W.3d at 84; *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 656 (Tenn.Ct.App.1993). If, on the other hand, the evidence and the inferences reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then no material factual dispute exists, and the question can be disposed of as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn.2002); *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 91 (Tenn.1999). A motion for summary judgment should be denied if there is any doubt regarding whether a genuine issue of fact exists. *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d 22, 41 (Tenn.2005); *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998) (quoting *Byrd v. Hall*, 847 S.W.2d at 211).

Not all factual disputes require the denial of a motion for summary judgment. Many factual disputes are minor or are not germane to the grounds of the motion. Thus, factual disputes warrant denial of a motion for summary judgment only when they are material. Tenn. R. Civ. P. 56.04 (requiring a moving party to demonstrate that there is no genuine dispute as to any "material fact"). To be material, a fact must be germane to the claim or defense on which the summary judgment is predicated. *Eskin v. Bartee*, 262 S.W.3d at 732; *Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn.1999).

Summary judgments do not benefit from a presumption of correctness on appeal. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 703 (Tenn.2008); *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d 366, 373 (Tenn.2007). Therefore, in each case, the reviewing courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Eskin v. Bartee*, 262 S.W.3d at 732; *Eadie v. Complete Co.*, 142 S.W.3d 288, 291 (Tenn.2004); *Staples v. CBL Assocs., Inc.*, 15 S.W.3d 83, 88 (Tenn.2000). The reviewing courts must also consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. *Cumulus Broad., Inc. v. Shim*, 226 S.W.3d at 373–74; *Abbott v. Blount County*, 207 S.W.3d 732, 735 (Tenn.2006).

## B.

Although we have concluded that the Court of Appeals erred by engrafting the element of reliance onto Tenn.Code Ann. § 48-2-122(b)(1), we have nevertheless determined that the trial court erred by granting Edna Green a summary judgment because the record contains genuine disputes regarding the material facts relating to the substance of Wesley Green's statements to Edna Green regarding the AmSouth Bank line of credit and the materiality of these statements.

### Wesley Green's Statements to Edna Green

The chancery court decided (1) that Wesley Green told Edna Green that she would be removed as a guarantor of Champs–Elysees's line of credit at AmSouth Bank if she sold her stock to him and (2) that Edna Green was not a guarantor on this line of credit. Based on these determinations, the chancery court concluded that Wesley Green's representation regarding the AmSouth Bank line of credit "was simply untrue." Wesley Green in-

sisted both in the chancery court and on appeal that his representation to his mother regarding the AmSouth Bank line of credit was true. The Court of Appeals did not address this issue.

In their Tenn. R. Civ. P. 56.03 statement of undisputed facts, Edna Green and Champs–Elysees asserted that "[Wesley] Green represented to Edna Green that if she sold her stock to him, AmSouth Bank would remove her as a guarantor on Champs–Elysees substantial line of credit." In his response, Wesley Green stated that "[t]his statement is disputed. [Wesley Green] told [Edna Green] that he had been personally told by Richard Coppen, a business banker at AmSouth Bank, that persons owning more than 20% of the outstanding stock were required to be signatories on the line of credit. [Wesley Green] never told his mother that she was on the line of credit." Notwithstanding Wesley Green's response, the chancery court relied on the factual assertion of Edna Green and Champs–Elysees in awarding them a summary judgment.

In his deposition, Wesley Green recounted the discussion regarding his mother being a guarantor of Champs–Elysees line of credit as follows:

> I never told my mother that I knew for a fact that she was on that loan or that I had seen her sign that loan. What I told her was ... that Richard Coppin at AmSouth Bank told me that everybody who had a 20 percent stake in the company, that the bank's policy was that they had to be on the loan. Therefore, I assumed that she was on the loan.
>
> And she told me that she didn't think she was on the loan, that she didn't remember signing the loan.

> And I said, well, Richard Coppin tells me that everybody with a 20 percent stake is on the loan, so I think that you might be.

Wesley Green also testified that "I told my mother that ... I thought that she was on the line of credit because of what Richard Coppin had told me." Accordingly, he maintained that he simply told his mother "what Richard Coppin told me."

Edna Green testified that Wesley Green "said that ... if I sold that stock, I would not be responsible for the loan at the bank that the company had." However, when addressing the question of whether Wesley Green "ever [said] anything more than just, I think you're on the loan," Edna Green responded "[n]ot that I know of."

The record makes it extremely difficult to assess whether Wesley Green made an untrue statement regarding the AmSouth Bank line of credit. Both the exact words spoken by Wesley Green and Edna Green and what was "really said" are very much in dispute in this case.

If Mr. Coppin told Wesley Green that bank policy required persons with more than twenty percent interest in a corporation to guarantee loans to the corporation, and if Wesley Green, believing Mr. Coppin's statements to be true, simply passed the information on to Edna Green, then Wesley Green's statements to his mother regarding her liability for the line of credit were not untrue. Further, viewed in the light most favorable to Wesley Green, these statements would not have been misleading but rather would have accurately reflected Wesley Green's concerns about his mother's liability for the loan and the source of these concerns.[42] Because of the

---

42. *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir.2002) (quoting *In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1551 (9th Cir.1994)) ("[A] statement that is literally true can be misleading and thus actionable under the securities laws."); *see also, e.g., Kaplan v.*

factual disputes and uncertainty surrounding the substance of the conversations between Wesley Green and Edna Green regarding the AmSouth Bank line of credit, the chancery court erred by concluding, as a matter of law, that Wesley Green's statements to his mother were untrue.

### The Materiality of Wesley Green's Statements

The chancery court decided to use an objective test to determine whether Wesley Green's statements to his mother regarding her liability on Champs–Elysees's line of credit were material. Accordingly, the court reasoned that regardless of whether Edna Green considered being released from liability on the line of credit to be important, a reasonable person would have considered being released from liability on a $75,000 line of credit as part of a sale of corporate stock to be significant. Therefore, the chancery court concluded, as a matter of law, that Wesley Green's statements to his mother regarding the AmSouth Bank line of credit were material. The Court of Appeals did not directly address this question.

In their arguments to this Court, the parties maintain their disagreement regarding the materiality of Wesley Green's statements to his mother regarding the AmSouth Bank line of credit. Wesley Green, adopting a subjective approach, asserts that his statements were not material because his mother did not rely on his statements and because she knew or believed that his statements were not correct. Edna Green, adopting an objective approach, counters that a reasonable person would consider being released from a $75,000 obligation to be an important factor in deciding whether to sell securities for $8,000.

The United States Supreme Court has followed a cautious approach when it has dealt with materiality determinations in the context of motions for summary judgment. The Court observed that in determining whether a summary judgment on the issue of materiality is appropriate, courts

> must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

*TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. at 450, 96 S.Ct. 2126. The Court has also expressed wariness about applying bright-line rules in assessing the "fact-specific finding ... [of] materiality" in securities actions. *Basic Inc. v. Levinson*, 485 U.S. 224, 236, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).[43] A majority of courts have similarly treated materiality as a factual issue and have left its resolution to the jury.[44] As was well summarized by Judge

---

*Rose*, 49 F.3d 1363, 1372 (9th Cir.1994); *In re Stellent, Inc. Sec. Litig.*, 326 F.Supp.2d 970, 985 (D.Minn.2004); *In re Par Pharm., Inc. Sec. Litig.*, 733 F.Supp. 668, 677 (S.D.N.Y. 1990).

**43.** *See also* Stefan J. Padfield, *Is Puffery Material to Investors? Maybe We Should Ask Them*, 10 U. Pa. J. Bus. & Emp. L. 339, 348 (2008).

**44.** Bloomenthal & Wolff, at § 13:18; 3 Alan R. Bromberg & Lewis D. Lowenfels, *Brom-*

Easterbrook writing for the United States Court of Appeals for the Seventh Circuit, "[m]ateriality is hard to pin down in the abstract ... [and] close cases should not be resolved by summary judgment." *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir.1989).

The parties in this case disagree about what Wesley Green actually said to Edna Green, when he first said it, and Edna Green's understanding or knowledge of the truth or falsity of his assertions. As previously discussed, the test of materiality is an objective inquiry. As a general matter, statements regarding the effects of a sale of corporate stock on the seller's personal liability for corporate debts would be deemed material to the transaction. However, we must view the facts and draw all reasonable inferences from the facts in the light most favorable to Wesley Green because he is the non-moving party. The total mix of information made available to the reasonable investor, viewed in such a light, includes in this case knowledge regarding signing such a loan and whether he or she is obligated thereupon. In light of the unsettled state of this record regarding what Wesley Green said and what Edna Green knew and understood, we conclude that the chancery court erred by determining, as a matter of law that Wesley Green's statements to Edna Green regarding the effect of her sale of the Champs–Elysees stock on her personal liability for the corporation's AmSouth Bank line of credit were material.

## VII.

### THE SUMMARY JUDGMENT ON CHAMPS–ELYSEES'S CLAIM

▉ The chancery court also granted Champs–Elysees a summary judgment on

its claim that Wesley Green misappropriated corporate funds by paying himself $46,600 from the corporation's account. The court reasoned that even if Wesley Green's claim that the company owed Dianne Green $90,000 in unpaid salary was true, Wesley Green "was nevertheless without any authority to appropriate Company funds to himself to satisfy an obligation which the Company is alleged to have had to Mrs. Dianne Green." The Court of Appeals reached a different conclusion. It found that the facts material to Champs–Elysees's misappropriation of corporate funds claim were disputed.

On appeal, Champs–Elysees offers two arguments for reversing the decision of the Court of Appeals to reverse the summary judgment on its misappropriation of corporate funds claim. First, it asserts that Wesley Green's claim that Mark Green and Mr. Fourier approved the payments to Wesley Green is so fanciful and farfetched that it should be disregarded. Second, it asserts that Wesley Green could not make payments to himself to remedy the under-payment of Dianne Green's salary, even with the approval of other corporate officers, because these payments were owed to Dianne Green, not to Wesley Green. Champs–Elysees argues, therefore, that the corporate officers could not approve permitting Wesley Green to pay money owed to Dianne Green to himself.

Wesley Green testified categorically that Mark Green and Mr. Fourier knew of and approved the payments he was making to himself and the purpose for which these payments were being made. The record lacks any contradiction of this testimony by either Mark Green or Mr. Fourier. In the face of Wesley Green's essentially un-

berg & Lowenfels on Securities Fraud and Commodities Fraud § 6:157 (2d ed. 2009); Hazen, at § 12.9[2]; Hicks, at § 6:133; 1

Roger J. Magnuson, Shareholder Litigation § 2:22 (2009).

contradicted testimony, we decline Champs–Elysees's invitation to weigh the evidence and to reject Wesley Green's assertion that other corporate officers were aware of and approved his making payments to himself.

Champs–Elysees also asserts that Mark Green's and Mr. Fourier's knowledge and approval of the payments that Wesley Green was making to himself is irrelevant because neither of them had authority to approve these payments to Wesley Green. It argues that if the corporation owed a debt, it was to Dianne Green, not to Wesley Green and, therefore, that the payments that Wesley Green was making to himself would not have discharged the corporation's liability to Dianne Green for the unpaid portion of her salary.

The cornerstone of the claim that Wesley Green's payments to himself were not for a corporate purpose is the premise that these payments would not have extinguished Dianne Green's claims against Champs–Elysees for her unpaid salary. There are two reasons why the present record is insufficient to permit reaching this conclusion as a matter of law. First, the testimony regarding Dianne Green's unusual and "confusing" post–1995 salary arrangement just does not support the conclusion that the under-payments were debts to Dianne Green. Many of the parties understood that Dianne Green's compensation was not only for her services but for Wesley Green's as well.[45] The record does not reflect whether the claimed under-payments were for services that Dianne Green provided or for services that Wesley Green provided. Second, the rec-

ord is silent with regard to the understanding between Wesley Green and Dianne Green about the payments that Wesley Green was making to himself. Thus, whether Dianne Green authorized, acquiesced, or objected to this method of addressing the under-payment of her salary is unknown.

Viewing the facts in the light most favorable to Wesley Green, the non-moving party, the factual foundation upon which Champs–Elysees has constructed its misappropriation of corporate funds claim is disputed and unresolved. The current record does not support the conclusions as a matter of law that only Dianne Green was entitled to recover the alleged salary under-payment or that Wesley Green's payment of corporate funds to himself would not have prevented Dianne Green from also recovering for the same debt from Champs–Elysees. Accordingly, we agree with the Court of Appeals that the chancery court erred by granting Champs–Elysees a summary judgment on its misappropriation of corporate funds claim.

## VIII.

### WESLEY GREEN'S AMENDED COMPLAINT

Both Champs–Elysees and Edna Green take issue with the Court of Appeals' direction to the chancery court to permit Wesley Green to file an amended complaint when the case is remanded for further proceedings. Their arguments are based on their belief that these amendments would be useless because the chancery court had correctly granted them a

---

**45.** Many of the corporate officers and directors, including Wesley Green and Dianne Green, apparently understood that a portion of Dianne Green's salary was attributable to the work being performed by Wesley Green and that Dianne Green's salary would be reduced should Wesley Green ever leave the company. In fact, after Wesley Green was terminated, Dianne Green's salary was reduced by the amount that "represented compensation for [Wesley Green] but which was paid to [Dianne Green] as [Wesley Green] had directed."

summary judgment on their respective claims against Wesley Green. In light of our conclusion that the Court of Appeals correctly reversed the summary judgments for Champs–Elysees and Edna Green, their basis for opposing the amended complaint has disappeared. Accordingly, Champs–Elysees has not persuaded us that the Court of Appeals erred by ordering the chancery court to allow Wesley Green to amend his complaint upon remand.

## IX.

We affirm the judgment of the Court of Appeals reversing the summary judgments in favor of Champs–Elysees and to Edna Green and directing the chancery court to permit Wesley Green to amend his complaint after the case is remanded for further proceedings. We tax the costs of this appeal in equal portions to John Wesley Green and to Edna Green and Champs–Elysees, Inc., jointly and severally, and their respective sureties for which execution, if necessary, may issue.