# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### March 20, 2012 Session

## BETTY C. GOFF CARTWRIGHT v. JACKSON CAPITAL, ET AL.

### Direct Appeal from the Chancery Court for Shelby County
### No. CH-04-1266-2    Arnold Goldin, Chancellor

---

### No. W2011-00570-COA-R3-CV - Filed June 5, 2012

---

This appeal involves various claims by a beneficiary of several trusts against his sister and her husband, who serve as the trustee and co-trustee of some of the trusts. The defendants/trustees filed a motion for partial summary judgment, claiming that they had followed the terms of the trusts and paid the beneficiary all distributions to which he was entitled pursuant to the trust documents. In response, the beneficiary asserted that the trust documents were void either because they were fabricated, or because he executed them due to undue influence. The trial court granted the defendants' motion for partial summary judgment, and the beneficiary voluntarily dismissed all of his remaining claims. The beneficiary appeals. We affirm in part, reverse in part, and remand for further proceedings.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Jerry E. Mitchell, Justin E. Mitchell, Memphis, Tennessee, for the appellant, Alan C. Cartwright

David Wade, Andrew Gardella, Memphis, Tennessee, for the appellees, Jackson Capital, et al

## OPINION

## I. FACTS & PROCEDURAL HISTORY

In the early 1950's, James and Betty Cartwright adopted two children, Alan and Alice. James Cartwright was an attorney, and over the years, he placed the wealth that he and his wife accumulated into numerous trusts for the benefit of his family members and others. James Cartwright died in 1994. In 2004, Betty Cartwright remarried and initiated this case by filing a complaint in the chancery court of Shelby County, naming as defendants her children Alan and Alice, Alice's husband, eighteen trusts, and two entities involved with the family limited partnership. Alice served as trustee of several trusts of which Betty was a beneficiary, and the complaint alleged that Alice had breached fiduciary duties, engaged in self dealing, and created impermissible conflicts of interest. Accordingly, the complaint sought to have Alice removed as trustee. The complaint also alleged that Alice and her husband had breached their fiduciary duties as general partners of the family limited partnership, and it sought to have the family limited partnership dissolved. Betty's complaint further alleged fraud, breach of contract, and breach of the duty of good faith and fair dealing. The complaint listed Betty's son Alan and the eighteen trusts simply as "Declaratory Defendants."

Alan Cartwright subsequently filed an answer and cross-claim against the other defendants, which stated, "To the extent that the allegations in the Complaint are found to be true, they are equally applicable to Alan Cartwright, and therefore, they are adopted and incorporated herein by reference as completely and fully as if restated herein verbatim[.]" Alan alleged that he had also been deprived of assets as a trust beneficiary, and he sought removal of Alice as trustee, in addition to access to the trust corpus to the extent that the court deemed appropriate.

Betty Cartwright died in May 2005, and thereafter, an order was entered dismissing with prejudice all of the claims set forth in her complaint against the original defendants. However, the cross-claim filed by Alan remained pending.

In 2007, Alan filed, in the *circuit* court of Shelby County, a "Complaint for Conspiracy to Commit the Tort of Conversion of Property of Plaintiff." The circuit court complaint named as defendants the same individuals, trusts, and entities that were named as defendants in the chancery court action, and the chancery court complaint was attached as an exhibit and incorporated by reference. The circuit court complaint alleged a conspiracy to convert Alan's trust funds to the defendants' own benefit, and a conspiracy to cause a breach of the fiduciary duties owed to him in order to deprive him of his property. It sought $50 million in damages.

The defendants in the circuit court case filed a motion to dismiss or transfer the matter to chancery court, asserting that the circuit court case was "against the same basic parties for the same basic purpose as the Original Suit which [was] still pending in Chancery Court." Alan opposed the motion to dismiss or transfer by emphasizing the differences in the subject matter of the two lawsuits. He insisted that the chancery court suit sought equitable relief due to trust mismanagement, which "revolved around allegations that [Alan] had not received sufficient distribution of assets" from the trusts. By contrast, Alan claimed, the tort suit sought damages due to an alleged conspiracy to convert assets from a number of different trust properties. Despite Alan's objections, however, the circuit court concluded that a "related matter" between the same parties had been pending in chancery court for several years, and it entered an order transferring the matter before it to chancery court.

In the chancery court, an order was entered dismissing the transferred circuit court matter without prejudice, but granting Alan permission to file an amendment to his chancery court complaint to include the additional allegations. Alan then amended his complaint to allege conspiracy to commit the tort of conversion of his property, and to request $50 million in damages.

Defendants later filed a motion to bifurcate the issues, for discovery and for trial, pursuant to Tennessee Rule of Civil Procedure 42.02. Defendants sought to separate from the other issues in the case the issue of whether Alan had received the distributions to which he was entitled under the various trust documents. Alan filed a response opposing the bifurcation of the issues. The trial court ultimately granted the motion to bifurcate the issues, concluding that "the issues of (1) the adequacy of distributions from the Trusts to the Plaintiff and (2) the tort claims seeking direct recovery under tort theories are so distinct and separable from one another that a trial of the first issue alone may be had without injustice." The trial court noted Alan's previous characterization of the claims as separate and distinct, when before the circuit court, in addition to the risk of juror confusion, and the fact that "substantial discovery" remained on the manipulation and self-dealing allegations. In sum, the court ordered that the issues regarding the express terms of the trust and partnership documents, and whether Alan had received the distributions owed to him according to those documents, would be tried first. The court ruled that "[t]estimony [could] be elicited, if necessary and appropriate, regarding the circumstances surrounding the creation and distributions from the various Trusts to the Plaintiff."

Alice and her husband, who served as co-trustee of some of the trusts, filed a motion for partial summary judgment with respect to Alan's claim for breach of fiduciary duty, asserting that they had fully complied with the terms of the trust documents and that Alan had

received all distributions to which he was entitled.[1] According to the defendants, the benefits and payments which Alan sought were contrary to the terms of the trust documents. The defendants argued that, as a matter of law, the trustees could not be found to have breached their fiduciary duties when the undisputed facts demonstrated that they had followed the directions of the trusts. They cited several provisions of the Tennessee Uniform Trust Code, including Tennessee Code Annotated section 35-15-801, which directs a trustee to follow the terms and purposes of the trust, and section 35-15-1006, which states, "A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust[2] to the extent the breach resulted from the reliance." In sum, the defendants argued that Alan could not prove that they had violated the terms of the trust documents or failed to pay him what he was due under the trust documents, and therefore, there was no basis for removing them from their position as trustees.[3]

In support of their motion for partial summary judgment, the defendants submitted numerous trust documents, interrogatory responses, and testimony by affidavit and deposition. This evidence showed that on June 30, 1978, James Cartwright and Alan Cartwright executed the "Alan Cook Cartwright Grantor Trust Agreement," which created

---

[1] Although the motion was titled "Defendants' Motion for Summary Judgment," it sought summary judgment only "as to this issue." The motion did not address all of the issues before the court, and the parties later referred to the motion as one for partial summary judgment.

We note that Alan also filed two motions for partial summary judgment, regarding whether Alice and her husband were general partners of the family partnership, and whether Alan was owed for overdue distributions from various trusts. These motions were heard along with the defendants' motion for partial summary judgment, and they were eventually denied. The denial of Alan's motions for partial summary judgment was not challenged on appeal.

[2] "A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." Tenn. Code Ann. § 35-15-1001(a).

[3] The defendants also argued in their motion for partial summary judgment that to the extent that Alan was challenging their decision to invest trust assets in the family limited partnership, he similarly could not prove that their decision constituted a breach of fiduciary duty because the trust documents and the Tennessee Uniform Trust Code authorized them to make such an investment. For example, the ACC Grantor Trust expressly authorized the trustee "to invest and reinvest all or any part of the corpus of the trust hereby established in such . . . investments, or other property as to him seem[s] advisable and proper, irrespective of whether the same are authorized for the investment of trust funds by the laws of the State of Tennessee or otherwise." The trustee was also empowered "[t]o invest in . . . partnership interests (whether general, special, or limited), or other securities or property . . . without being limited by any statute or rule of law governing investments by Trustee." Alan's response to the motion for partial summary judgment did not address these issues. The trial court's order granting partial summary judgment expressly stated that it encompassed the issues surrounding the family limited partnership documents, and Alan does not address that portion of the order on appeal. Thus, we will not discuss it further in this opinion.

what the parties commonly refer to as the ACC Grantor Trust. The Trust Agreement provided that the ACC Grantor Trust would "provide for [Alan's] personal financial security by preserving his property against his own spend thrift actions," as Alan was "not experienced in financial matters." According to the Trust Agreement, Alan was limited to drawing 75% of the net income of the ACC Grantor Trust for his use or benefit. The Trust Agreement provided that the ACC Grantor Trust was irrevocable, and that the Trust Agreement could only be amended or terminated upon written agreement of the trustee and Alan.[4] James Cartwright was named as the trustee, and Betty was named as the successor trustee. Pursuant to a later amendment, Alan's sister Alice was named as an alternate successor trustee, who would serve in the event that Betty became unwilling or unable to act as trustee.

James Cartwright died on September 11, 1994. "Amendment Number One" to the ACC Grantor Trust was executed by Alan, who was about 43 years old at the time, and his mother Betty, who had assumed the position of trustee, on or about September 7, 1995. The Amendment stated, in relevant part:

> During Settlor's [Alan's] lifetime, the Trustee shall pay (i) the lesser of $84,000 per year or one hundred percent (100%) of the net annual income of the trust in convenient installments, or otherwise, to or for the benefit of Settlor, plus (ii) such additional amount as the Trustee determines is necessary to pay the federal and state income tax of the Settlor[.] In computing the annual net income of the trust, any distributions of income from the trusts identified on Exhibit A which are added to this trust shall be considered income. . . .
>
> The Settlor directs the trustees of the trusts listed in Exhibit "A" hereto to pay all amounts distributed to the Settlor under such trusts to the Trustee hereunder, such amounts to be added to the corpus of the Trust and distributed in accordance with its terms, and the Trustee hereby consents to such additions.

The referenced "Exhibit A" to the Amendment listed 15 other trusts of which Alan was a beneficiary. Therefore, pursuant to the terms of the Amendment, all amounts to be distributed to Alan from the 15 trusts would instead be added to the corpus of the ACC

---

[4] The Tennessee Uniform Trust Code similarly provides that, "during the settlor's lifetime, a noncharitable irrevocable trust may be modified or terminated by the trustee upon consent of all qualified beneficiaries, even if the modification or termination is inconsistent with a material purpose of the trust if the settlor does not object to the proposed modification or termination." Tenn. Code Ann. § 35-15-411(a).

Grantor Trust, and therefore, subject to distribution under its terms. According to Alice's testimony, her mother directed the family attorney to prepare this Amendment, requiring all distributions to Alan to be made through the ACC Grantor Trust, in order to carry out the desire of Alan's recently deceased father to protect the assets from Alan's spendthrift tendencies, but also to ensure that there would be enough assets available to pay Alan his increased "allowance" of $7000 per month pursuant to the Amendment.

According to Alice's affidavit testimony, her mother later learned that Alan had acquired several vehicles, and she became upset about his high-interest car notes and speeding tickets. Betty then informed Alan that he would have to sell some of the vehicles and reimburse the Trust for the excessive expenses associated with them, such as auto insurance, which the Trust was paying on Alan's behalf. The Trust would also pay off the car notes. Consequently, Betty and Alan executed another amendment to the ACC Grantor Trust on April 29, 1996, which reduced his monthly distribution to $5000. The second amendment was inadvertently also titled "Amendment Number One," and it contained the same language quoted above, regarding the monthly allowance, and the addition of any distributions from the trusts in Exhibit A to the ACC Grantor Trust. However, it substituted $60,000 for the $84,000 figure in the first Amendment.

In December 1999, another amendment was executed by Alan and Betty, naming Alice as co-trustee of the ACC Grantor Trust, effective January 1, 2000. After Alice was named co-trustee, she and her mother increased Alan's monthly distribution to $7000 again, but the parties never executed another amendment to reflect this change.

According to Alice's testimony, her practice over the years, as trustee of the ACC Grantor Trust, was to treat the specific dollar amounts listed in the Amendments as the amount that Alan would receive, even though the language of the Amendments provided that he would receive *the lesser of* 100% of the trust income or $84,000 per year. She explained that even when there was a substantial market downturn, or little to no income for distribution, she paid Alan a direct distribution of the amount referred to in the trust documents. As a result, she explained, Alan had received direct distributions of either $5000 or $7000 per month since 1995. Alice testified that over the years, the ACC Grantor Trust had also paid for Alan's major expenses, including all taxes, insurance (home, health, and automobile), medical costs, and home maintenance costs, and the ACC Grantor Trust also acquired and owned the home where Alan lived. She produced a spreadsheet indicating that Alan had received distributions of $592,477 in the past five years, and also, $696,437 in expenses were paid on his behalf during that time. In sum, Alice testified that all required distributions had been made to Alan through the ACC Grantor Trust, in accordance with the controlling trust documents.

Alan filed a response to the defendants' motion for partial summary judgment with the following three-paragraph argument:

1. Since the death of Betty Goff Cook Cartwright in May of 2005, in addition to the Amended and Restated Alan Cook Cartwright Grantor Trust from which he receives an allowance, Cross-Plaintiff, Alan Cartwright, has been a primary beneficiary of [15 other trusts.] Contrary to the intent of the grantors and contrary to the terms of these trusts, Alan Cartwright has received no distributions from them for over five (5) years due to the [defendants'] knowing, intentional and improper manipulation of investments and distributions at the Partnership level to dry up the income stream by diverting any such trust funds away from income producing investments and into long term growth investments, contrary to the fiduciary obligations owed to him as imposed by the prudent investor requirement.

2. The [defendants] have systematically knowingly acted with malicious intent to subvert and ignore their duties as trustees by violating their fiduciary duty to put the interests of the primary beneficiary ahead of their own interests and the interests of the [family limited partnership], as evidenced by their own admissions in sworn testimony that their obligations as trustees have been superseded by their loyalty to [the family limited partnership], which they control.

3. The [defendants], both directly and indirectly by employing duress and undue influence by others, knowingly and maliciously defrauded the beneficiary of these trusts, Alan Cartwright, by trickery and by deception in failing to present alleged "Exhibit A" for review and in failing to explain the practical operation and consequences of the First Amendment(s) to the Amended and Restated Alan Cook Cartwright Grantor Trust at the time Cartwright was urged to sign the amendments to his Grantor Trust while under economic duress and/or by creating a false "Exhibit A" at a later time, all in contravention of the fiduciary duties owed to him at those times and all subsequent times thereto. As a result, the existence and operation of the so called "Exhibit A" is void and the First Amendment(s) are void as being made by the Grantor being led into a clear mistake of law and fact as to the meaning and consequences of executing the signature page that day.

In response to the defendants' statement of undisputed facts, Alan disputed one statement regarding "Exhibit A" to the Amendments, which listed the 15 trusts to be added to the ACC Grantor Trust. Alan contended that "reasonable minds could very well conclude that no such

-7-

document existed until sometime later and that it is a fake." As support for this assertion, Alan pointed to the following facts: Exhibit A appears to be a copy of a typewritten document, not an original; there are no signatures on Exhibit A; it does not contain a page number; the notary who attested to Alan's signature testified that she does not recall meeting him; and the family attorney did not produce Exhibit A when he brought other trust documents to his deposition.

Alan also submitted several excerpts from his depositions, apparently in an effort to demonstrate undue influence. Alan testified that when he signed the first Amendment Number One to the ACC Grantor Trust, he did not understand that he would be limited to the lessor of $84,000 per year or the income from the trust because no one told him. When asked whether he asked his mother what he was signing, Alan replied, "I didn't ask her anything. You don't ask questions in my family. You just do what they tell you to do." Alan conceded that he received $7000 per month in distributions from the ACC Grantor Trust until the issue arose about his ownership of numerous vehicles. Alan recalled his mother telling him that he was going to receive less money each month until the trust was reimbursed for the cost of his additional vehicles. However, Alan testified that he did not remember if he was with his mother when he signed the second Amendment Number One, and he also said, "I don't remember anybody telling me about 60,000 a year." Alan testified that he did not remember reading the document or having anyone explain it to him. He said,

> I didn't read this, but then again if I – I don't even remember – I don't know what this is. I never have seen this. I mean, I might have signed it, but maybe the rest of it wasn't there or something like this. I didn't - I don't know – I don't remember Mom signing it. When she signed it, she didn't tell me what it was. I don't know what -- what else do I say here. I don't know how else to explain it.

Despite these protestations, Alan submitted a statement of undisputed facts in which he admitted that Betty, Alice, and the family attorney were present in the room with him when the second amendment to the ACC Grantor Trust was signed.

In reply to Alan's response, the defendants contended that there was no genuine issue of material fact regarding the validity or authenticity of Exhibit A. They submitted Alice's deposition testimony in which she testified that Exhibit A was found in the file folder that contained the other trust documents, although it was not attached to the Amendments. Alice acknowledged during her deposition that Exhibit A appears to be a photocopy of a typewritten document. She testified that she could not recall who prepared the original, and she said that she may have typed it herself. Nevertheless, the defendants contended that it was not necessary for Exhibit A to be an original document in order to be a valid document,

and they argued that whether the original was prepared by Alice, the family attorney, or someone else, was of no legal significance. The defendants also pointed out that the family attorney was never asked during his deposition about Exhibit A, and he testified that the documents he produced were in response to a query in which he searched his computer for documents containing the term "Alan C." Exhibit A does not contain Alan's name; it simply states, "Exhibit 'A'" and lists the fifteen trusts. There are no signature lines on Exhibit A to require a signature, and the other pages of the Amendments are not page numbered either. The notary's testimony cited by Alan was apparently from a deposition that was never filed in the trial court.

The defendants also argued that, despite Alan's conclusory assertions, the undisputed facts did not establish undue influence. They submitted Alice's deposition testimony wherein she suggested that the first Amendment may have been sent to Alan at his home in Hendersonville, because his signature was notarized in Sumner County, Tennessee, while Betty's signature was notarized five days earlier in Shelby County, Tennessee. With regard to the second Amendment, Alice testified that she specifically recalled the meeting at which Alan and her mother signed the Amendment. She testified that the meeting took place in Memphis, and that she was present, along with Alan, Betty, and the family attorney, Shellie McCain. Alice recalled that her mother got "really mad" because after she had increased Alan's monthly distribution, she found out that he had acquired three trucks and was paying notes on a couple of them. Alice recalled her mother telling Alan that he had to sell one of the trucks and that she was going to reduce his monthly distribution in order for him to repay the trust for paying off the balance on one of the notes. Alice testified that she did *not* recall a situation in which her mother instructed Alan to "just sign it." She said that Mr. McCain was there "to go over things with [Alan]," and that Mr. McCain "told Alan what we were doing." She also testified that Exhibit A was discussed at the meeting.

The defendants submitted testimony from the deposition of the former family attorney, Shellie McCain, as well. At Mr. McCain's deposition in 2009, he testified that, to the best of his recollection, he was present for at least one meeting when Alan signed amendments to the ACC Grantor Trust. Mr. McCain could not recall how many of such meetings he attended. However, he stated that his "most vivid memory" was "sort of a family sit down presided over by Mrs. [Betty] Cartwright" to discuss Alan's spending, and particularly his acquisition of a number of automobiles and the cost of keeping those automobiles insured. He recalled that "Alan arrived in a somewhat non-communicative mood with anyone in the office," but when Betty arrived, "Alan was suddenly communicative and yes ma'am, no, ma'am and very much acknowledging his mother's concerns." Mr. McCain testified that Alan essentially wanted to know how many cars he could keep. He explained, "Mrs. [Betty] Cartwright was a very nice lady, but when she wanted to exercise her authority, she was fairly formidable." Mr. McCain said he did not remember the specifics of what he discussed

with Alan during the meeting "other than if he signed documents in my presence, I'm certain that, you know, any questions he had I would have answered about those documents." Mr. McCain went on to say,

> It is my recollection hazy as though it may be, that the purpose of inviting me to the office when Alan was there was to give Alan the opportunity to ask me questions. I don't remember if I gave preliminary overview to Alan about what, you know, at any point was being done in connection with the family's overall estate planning. I just don't remember. What I do remember is generally when I was in Alan's presence or when Alan was in my presence, he was generally and frankly somewhat indifferent to what was going on in the family business, if you will.

Mr. McCain testified that when he sat down with someone to present a document for his or her signature, it was his normal practice to explain what it was he or she was signing. He said he could not remember the specifics of what he discussed with Alan, but, he said, "if I was present when a document was signed, then if Alan Cartwright wanted to, I'm assuming that I probably explained what the document was he was signing and if he had questions, answered it."

During Alan's deposition, he testified that he did recall attending a meeting with Mr. McCain, Betty, Alice, and Alice's husband. He said, "I think they just told me $84,000 a year and sign it." When asked whether he agreed for the trust to pay him that amount, he replied, "Yeah, I – I agreed, and I did sign this," but, he said he did not think that was all of the money that he would receive. He conceded that he did not ask whether he would receive any more money, stating, "like again they might have told me – or this, but the main thing they just told me was to sign the paper. Here, sign the paper." Alan initially testified that no one told him, beforehand, that his annual distribution was going to be reduced to $60,000, and that he called Betty for an explanation when he received his first "light" check. However, Alan later testified that when he had the conversation with Betty about the trust paying off his car notes, he was in Memphis, and "[Alice and her husband] . . . they were all in there." As noted above, his own statement of undisputed facts admitted that Betty, Alice, and the family attorney were present in the room with him when he signed the second amendment to the ACC Grantor Trust.

The trial court ultimately entered an order granting the defendants' motion for summary judgment. The court found that the trust documents expressed the intention of Alan and his parents to provide for him but also to limit his access to unlimited funds. The court noted that Alan admittedly signed the original and all Amendments to the ACC Grantor Trust Agreement. The court noted that the Amendments set specific limitations on Alan's

distributions and required that distributions from other trusts be added to the ACC Grantor Trust. The court found that the trustees were entitled to rely upon the terms of the trust documents, and that they had "done what they were entrusted to do." The court found "no dispute that the Trustees paid out to [Alan] the amounts to which he was entitled under the documents as written." The court found it undisputed that the trustees had relied upon the terms of the trust, and it found that they were entitled to do so pursuant to Tennessee Code Annotated section 35-15-1006. Regarding the allegations of undue influence, the trial court noted that many years had passed since Alan and his parents signed the trust documents, and that his parents were no longer living. The court stated, "In light of the language of the documents and the passage of time, the Court cannot give weight to [Alan's] allegations of undue influence against his parents." Therefore, the court entered partial summary judgment in favor of the defendants on the issues surrounding the terms of the family limited partnership documents and the trust documents; whether Alan received the distributions to be made to him under the trust documents; and whether the defendants breached their fiduciary duties in conducting their responsibilities as trustees.

All remaining claims asserted by Alan, not resolved by the motion for partial summary judgment, were voluntarily dismissed without prejudice. Alan timely filed a notice of appeal of the order granting partial summary judgment to defendants.

## II.    ISSUES PRESENTED[5]

Alan presents the following issues on appeal:

1.    Whether the trial court erred in granting the defendants' motion for summary judgment;
2.    Whether the trial court abused its discretion in granting the defendants' motion for

---

[5] Although the record on appeal consists of 39 volumes, and over 3000 pages of technical record alone, the facts section of Alan's brief on appeal did not contain a single citation to the record. In addition, the argument section did not contain citations to the record or citations of appropriate authority with regard to some issues. As such, this Court entered an order granting the defendants' motion to strike the deficient portions of Alan's brief. As a result, some arguments raised in Alan's brief on appeal will not be discussed in this opinion. The reply brief filed by Alan also contained very few citations to the record, and it attempted to present arguments not advanced in his initial brief or in the trial court below. Those assertions will likewise not be considered on appeal. "A reply brief is a response to the arguments of the appellee. It is not a vehicle for raising new issues." *Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) (citing Tenn. R. App. P. 27(c); *Denver Area Meat Cutters & Employers Pension Plan v. Clayton*, 209 S.W.3d 584, 594 (Tenn. Ct. App. 2006)). "A reply brief is limited in scope to a rebuttal of the argument advanced in the appellee's brief." *Clayton*, 209 S.W.3d at 594. It would be fundamentally unfair to permit an appellant to advance new arguments in the reply brief, as the appellee may not respond to a reply brief. *Id.*

bifurcation.

For the following reasons, we affirm the decision of the chancery court in part, and we reverse in part and remand for further proceedings.

### III.  STANDARD OF REVIEW[6]

A motion for summary judgment should be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." **Tenn. R. Civ. P. 56.04.** "When ascertaining whether a genuine dispute of material fact exists in a particular case, the courts must focus on (1) whether the evidence establishing the facts is admissible, (2) whether a factual dispute actually exists, and, if a factual dispute exists, (3) whether the factual dispute is material to the grounds of the summary judgment." *Green v. Green*, 293 S.W.3d 493, 513 (Tenn. 2009).

"The party seeking the summary judgment has the burden of demonstrating that no genuine disputes of material fact exist and that it is entitled to a judgment as a matter of law." *Green*, 293 S.W.3d at 513 (citing *Martin v. Norfolk S. Ry.*, 271 S.W.3d 76, 83 (Tenn. 2008); *Amos v. Metro. Gov't of Nashville & Davidson County*, 259 S.W.3d 705, 710 (Tenn. 2008)). "The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." *Martin*, 271 S.W.3d at 83 (citing *Hannan*, 270 S.W.3d at 5). In order to negate an essential element of the claim, "the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party." *Id.* at 84 (citing *Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004)). "If the moving party is unable to make the required showing, then its motion for summary judgment will fail." *Id.* (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)).

---

[6]  We note that in their brief on appeal, the defendants asked us to apply the summary judgment standard set forth in Tennessee Code Annotated section 20-16-101. They acknowledged that the language of the original bill provided that this standard would apply to actions filed on or after July 1, 2011, and the instant case was filed in 2004. However, the defendants claim that because the *statute as published* does not contain the effective date referred to in the bill, we must apply the statute. We disagree. "When conflicts arise between an Act as adopted by the legislature and the same Act as subsequently published, the version adopted by the legislature controls." **Kaiser v. State**, No. 01-A-019110BC00359, 1992 WL 141014, at *2 (Tenn. Ct. App. M.S. Jun. 24, 1992) (citing *Weaver v. Davidson County*, 104 Tenn. 315, 321-323, 59 S.W. 1105 (1900)). Therefore, we must apply the summary judgment standard set forth in **Hannan v. Alltel Publ'g Co.**, 270 S.W.3d 1 (Tenn. 2008), and its progeny.

If the moving party does make a properly supported motion, "[t]he non-moving party must then establish the existence of the essential elements of the claim." ***McCarley v. West Quality Food Serv.***, 960 S.W.2d 585, 588 (Tenn. 1998)). The nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. ***Martin***, 271 S.W.3d at 84 (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215). "The nonmoving party may satisfy its burden of production by: (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06." ***Id.*** (citing *McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215 n.6). "The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party." ***Id.*** (citing *McCarley*, 960 S.W.2d at 588).

The resolution of a motion for summary judgment is a matter of law, which we review de novo with no presumption of correctness. ***Id.*** However, "we are required to review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." ***Id.*** (citing *Staples v. CBL Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

## IV. DISCUSSION

### A. *Summary Judgment*

As Alan explained early in these proceedings, this case revolves around allegations that Alan had not received sufficient distributions of assets from the trusts. The defendants argued in their motion for partial summary judgment that Alan could not prove that they had failed to pay him the amounts required by the trust documents, or that they had otherwise failed to comply with the trust documents. According to the defendants, the undisputed facts demonstrated that they had followed the trust terms, and therefore, they could not be held to have breached their fiduciary duties. They cited several provisions of the Tennessee Uniform Trust Code, including Tenn. Code Ann. § 35-15-801, which directs a trustee to follow the terms and purposes of the trust, and § 35-15-1006, which states, "A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance."

In support of their motion, the defendants submitted evidence establishing that in 1995, while Betty was the trustee, Alan signed the first Amendment to the ACC Grantor Trust, increasing his distribution from 75% of the income of the trust to 100% of the income

of the trust, but not to exceed $84,000 per year. The Amendment further provided that all amounts to be distributed to Alan from the 15 trusts listed on Exhibit A would instead be added to the corpus of the ACC Grantor Trust. In 1996, Alan signed the second Amendment, lowering the limit on his annual distribution to $60,000 per year. Alice became a co-trustee of the ACC Grantor Trust effective January 1, 2000. She testified that since 1995, Alan had received either $5000 or $7000 per month, meeting or exceeding the amounts required by the trust documents, in addition to the payment of his major expenses. Based on this evidence, we conclude that the defendants' motion for summary judgment was properly supported, and the burden of production shifted to Alan to demonstrate that a genuine issue of material fact existed.

Alan's response to the defendants' motion for partial summary judgment consisted of a three paragraph argument that was riddled with legal conclusions and conclusory assertions. However, he basically argued before the trial court, and now argues on appeal, that Exhibit A was void either because it was a fabrication, or because he signed the Amendments due to undue influence.[7] On appeal, Alan continues to argue that a fact question exists as to whether Exhibit A was ever actually a part of the Amendment documents. He points to several facts which, he contends, raise a question as to the genuineness of the document: Exhibit A appears to be a photocopy of a typewritten document, not an original document; there are no signatures on Exhibit A; it does not contain a page number; and the family attorney did not produce Exhibit A when he brought other

---

[7] Alan argued in his response:

> The [defendants], both directly and indirectly by employing duress and undue influence by others, knowingly and maliciously defrauded the beneficiary of these trusts, Alan Cartwright, by trickery and by deception in failing to present alleged "Exhibit A" for review and in failing to explain the practical operation and consequences of the First Amendment(s) to the Amended and Restated Alan Cook Cartwright Grantor Trust at the time Cartwright was urged to sign the amendments to his Grantor Trust while under economic duress and/or by creating a false "Exhibit A" at a later time, all in contravention of the fiduciary duties owed to him at those times and all subsequent times thereto.

His response did not elaborate on the factual basis for his assertions. "When the party seeking summary judgment makes a properly supported motion, the burden then shifts to the nonmoving party to set forth specific facts, not legal conclusions," to establish a genuine issue of material fact. *Byrd*, 847 S.W.2d at 215. "Mere conclusory generalizations will not create a material factual dispute sufficient to prevent the trial court from granting a summary judgment." *Davis v. Campbell*, 48 S.W.3d 741, 747 (Tenn. Ct. App. 2001); *see also Mechanics Laundry Serv. v. Auto Glass Co. of Memphis, Inc.*, 98 S.W.3d 151, 158 (Tenn. Ct. App. 2002) ("Mere conclusory allegations will not suffice to support or defeat a motion for summary judgment.")

trust documents to his deposition.[8] We agree with the defendants' argument that these circumstances fail to demonstrate a genuine issue of material fact regarding whether Exhibit A is genuine.

"A disputed fact presents a genuine issue if 'a reasonable jury could legitimately resolve that fact in favor of one side or the other.'" *Martin*, 271 S.W.3d at 84 (quoting *Byrd*, 847 S.W.2d at 215). In other words, "[i]f reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." *Green*, 293 S.W.3d at 514 (citing *Martin*, 271 S.W.3d at 84; *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 656 (Tenn. Ct. App. 1993)). "If, on the other hand, the evidence and the inferences reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then no material factual dispute exists, and the question can be disposed of as a matter of law." *Id.* (citing *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *Seavers v. Methodist Med. Ctr. of Oak Ridge*, 9 S.W.3d 86, 91 (Tenn. 1999)).

Here, it is undisputed that Exhibit A was found in the file folder containing the other trust documents, although it was unattached. Both Amendments clearly refer to Exhibit A. It is undisputed that Exhibit A appears to be a photocopy of a typewritten document. Exhibit A is simply titled "Exhibit A" at the top, and it lists the names of the 15 trusts. There are no signatures on Exhibit A, but there are no signature lines requiring a signature. Similarly, Exhibit A does not contain a page number, but the Amendments to the ACC Grantor Trust, which Alan admittedly signed, did not contain page numbers either. The family attorney produced numerous trust documents at his deposition, which he testified were produced in response to a query for his computer to identify documents containing the phrase "Alan C." Exhibit A does not contain that phrase. The family attorney was not asked any questions about Exhibit A, and to our knowledge, he did not mention it during his deposition. We are also unaware of any testimony by Alan specifically mentioning Exhibit A. However, Alan later admitted before the trial court that the distributions he had received from the ACC Grantor Trust were consistent with Exhibit A. Considering all of these circumstances, we find no genuine issue of material fact regarding the authenticity of Exhibit A. The evidence and the inferences *reasonably* drawn from the evidence permit but one conclusion, that Exhibit A is authentic. As such, we affirm the trial court's decision to grant partial summary judgment to the defendants on the issues surrounding the terms of the trust documents, and

---

[8] Alan also makes several arguments on appeal that are not supported by the record. He claims that the notary who attested to Alan's signature on the second Amendment testified that she does not recall meeting him. We note that Alan does not dispute that he signed the Amendment. In any event, however, the notary's testimony is not in the record before us, and therefore, we will not consider it for purposes of summary judgment. In addition, we will not consider the assertions in Alan's brief regarding his opinion as to the apparent age and quality of the documents, nor will we consider, for purposes of summary judgment, the issue of whether Exhibit A was not produced until the later stages of discovery.

whether Alan received the distributions to be made to him under the trust documents as written.

Next, we must address Alan's allegation of undue influence. A trust can be set aside, in whole or in part, or reformed, on the same grounds as those which apply to a transfer of property not in trust. Official Comment to Tenn. Code Ann. § 35-15-406. As such, "[a] trust is void to the extent its creation was induced by fraud, duress, or undue influence." Tenn. Code Ann. § 35-15-406.

The *evidence* submitted by Alan regarding undue influence is somewhat unclear due to the inconsistencies in his testimony during his two depositions, in 2007 and in 2009.[9] At one point, Alan testified that when he signed the first Amendment, he did not understand that it meant that he would receive the lesser of $84,000 or all of the income from the trust, because no one told him that information or instructed him to read the document. He stated that he did not ask his mother anything when he signed the document, stating, "You don't ask questions in my family. You just do what they tell you to do." He concedes in his brief on appeal that he executed this Amendment at his home in Sumner County, where he had it notarized before he returned it to his mother in Memphis.

Regarding the second Amendment, which contained the same language but reduced the cap to $60,000, Alan initially testified that he could not remember if he was with his mother when he signed it, stating:

I didn't read this, but then again if I – I don't even remember – I don't know what this is. I never have seen this. I mean, I might have signed it, but maybe the rest of it wasn't there or something like this. I didn't - I don't know – I don't remember Mom signing it. When she signed it, she didn't tell me what it was. I don't know what -- what else do I say here. I don't know how else to explain

---

[9] We also note that in Alan's brief, reply brief, and supplemental statement of facts on appeal, he has pointed to many facts in the voluminous record in an effort to demonstrate a genuine issue of material fact. However, many of these facts were not brought to the trial court's attention in Alan's response to the defendants' motion for summary judgment, and some of the "facts" he mentions were not even included in the record before the trial court. In considering whether the trial court erred in granting summary judgment, we will look to the evidence that the parties presented to the trial court at each stage of the summary judgment proceedings in order to decide whether the parties met their burden of production and whether a genuine issue of fact existed. *See Martin*, 271 S.W.3d at 84 (explaining that the nonmoving party may satisfy its burden of production by pointing to evidence that was over-looked or ignored by the moving party, producing additional evidence, rehabilitating the evidence attacked, or explaining the necessity for further discovery).

it.[10]

He said "they never told me what I signed, and they just said sign it." However, Alan later admitted that he signed the second Amendment during a meeting attended by Betty, the family attorney, and Alice. Alan testified about his recollection of the meeting as follows:[11]

Q.   Well, was your mother there at the time that you signed this document?
A.   I guess. I don't – I don't remember – I don't remember. If it had – if it was the same time th[at] Shellie McCain was in there, the only one time I saw it, I think it was me and Shellie and Mom and Alice and [Alice's husband].
Q.   Well, whether or not McCain —
A.   I think.
Q.   – was there at this time, do you remember discussing with your mother that the trust was going to be set up in this way so that you would get $7,000 a month?
A.   I think they just told me $84,000 a year and sign it.
Q.   And did you sign it?
A.   Yeah. Well, I signed right here. I guess I did. Yeah, that's right, I signed it.
Q.   And did you agree that that is – that this trust was going to then pay you $7,000 a month?
A.   *Yeah, I – I agreed*, and I did sign this and –
Q.   Okay.
A.   But I didn't – let's see. That was – that was – I guess that's – I didn't think that was all I could – all I was going to get though. I guess –
Q.   Did you ask her that question whether that would be all you would get?
A.   No, no, *like again they might have told me* – or this, but the main thing they just told me was to sign the paper. Here, sign the paper.
Q.   And do you remember having a discussion with your mother about the number of automobiles you had?
A.   Oh yeah. Oh, yeah.

---

[10] Here, Alan was only questioned regarding the text of the Amendment itself, not Exhibit A. Alan was not asked any questions concerning Exhibit A during this deposition.

[11] This excerpt is from Alan's first deposition, and he mentioned the $84,000 figure when discussing the meeting he attended with his mother, Alice, and the family attorney. However, Alan now admits that he signed the first Amendment, referencing $84,000, in Hendersonville, and it was the second Amendment, referencing $60,000, that was signed at the family meeting.

(Emphasis added). In sum, Alan's insistence that no one told him anything is contradicted by his own testimony. Alan's own brief on appeal explains that "Alan was summoned to Memphis, where he was advised that his theretofore monthly stipend of $7,000 was being reduced to $5,000 in order to pay off the vehicles." Thus, it is undisputed that he was told the amount of money that he would receive pursuant to the Amendment. Although Alan initially testified that he did not think that was *all* of the money he would receive, he admitted that he did not ask any questions, and he conceded that "they might have told me." Alice testified affirmatively that Exhibit A was discussed at the family meeting, and that Mr. McCain explained to Alan what the parties were doing. Mr. McCain, testified that he had a "vivid memory" of the meeting attended by Alan and his mother, in which the parties discussed Alan's spending and his acquisition of numerous vehicles, and he also recalled being present when Alan signed an amendment to his ACC Grantor Trust. Mr. McCain could not specifically recall what he discussed with Alan, but he said that "if Alan Cartwright wanted to, I'm assuming that I probably explained what the document was he was signing and if he had questions, answered it." Mr. McCain noted, though, that Alan was "generally and frankly somewhat indifferent to what was going on in the family business."

On appeal, Alan's sole argument regarding the issue of undue influence is that the burden is on the dominant party in a confidential relationship to prove that a transfer was in fact the conscious desire of the beneficiary. The case cited by Alan for this assertion actually stated,

> Tennessee cases have consistently held that the existence of a confidential or fiduciary relationship, *together with a transaction by which the dominant party obtains a benefit from the other party*, gives rise to a presumption of undue influence that may be rebutted.

*Matlock v. Simpson*, 902 S.W.2d 384, 385 (Tenn. 1995) (emphasis added); *see also Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977) ("when two parties enter into a confidential or fiduciary relationship *and the dominant party receives a gift or other benefit from the other party* a presumption arises that some improper advantage was taken") (emphasis added). Here, *Betty* was the trustee of the ACC Grantor Trust at the time of execution of the Amendments. As such, a confidential relationship existed between her and Alan, but Alan has failed to demonstrate how Betty benefitted from the transactions. This does not end our analysis, however. When the first and second Amendments to the ACC Grantor Trust were executed, *Alice* held the position of trustee of some of the trusts listed on Exhibit A. Therefore, a confidential fiduciary relationship also existed between Alice and Alan at the time of the signing of the Amendments. It is undisputed that Alice was a contingent beneficiary of the ACC Grantor Trust. Under the terms of the ACC Grantor Trust, if Alan died without a surviving spouse or descendent, the trustee was directed to

distribute the remaining corpus of the trust to Alice.[12]  Still, it is not clear from the record before us whether the execution of the Amendments would constitute "a transaction by which the dominant party [Alice] obtain[ed] a benefit from the other party [Alan]," which would give rise to a presumption of undue influence that could only be rebutted by clear and convincing evidence of fairness.  *Matlock*, 902 S.W.2d at 385.  The effect of the Amendments was to *increase* Alan's distributions from 75% to 100% of the income of the trust, *but* subject to the annual "cap."  There is no evidence in the record regarding the amount of trust income generated in any given year, other than Alice's undisputed testimony that during the years when the trust had little to no income, Alan received the "lump sum" figure stated in the Amendments.  In other years, however, it is not clear how much money Alan would have received if the "cap" had not been imposed on his annual distributions.  It is reasonable to infer, for purposes of summary judgment, that because of the cap on Alan's annual distributions, there is the potential for more money to remain in the corpus of the ACC Grantor Trust for potential future distribution to Alice as a contingent beneficiary.  At the very least, we conclude that a genuine issue of material fact exists with respect to this issue.

In sum, we find that a genuine issue of fact exists regarding the ultimate issue of whether undue influence was used to accomplish these transactions.  "The determination of whether the dominant party exerted undue influence is a question of fact."  *In re Estate of Copas*,  No. E2010-00877-COA-R3-CV, 2012 WL 171966, at *10 (Tenn. Ct. App. Jan. 20, 2012) (citing *Waller v. Evans*, No. M2008-00312-COA-R3-CV, 2009 WL 723519, at *9 (Tenn. Ct. App. Mar. 17, 2009)).  If the presumption of undue influence arises, then the dominant party bears the burden to prove by clear and convincing evidence that the transaction was the result of the other party's free will and not a result of his or her influence.  *Id.* at *11.  A lack of suspicious circumstances can rebut the presumption, as can a showing of independent advice.  *In re Estate of Murdaugh*, No. W2011-00041-COA-R3-CV, 2011 WL 6141067, at *3 (Tenn. Ct. App. Dec. 8, 2011) (citing *Parish v. Kemp*, 308 S.W.3d 884, 891 (Tenn. Ct. App. 2008); *Matter of Estate of Depriest*, 733 S.W.2d 74 (Tenn. Ct. App. 1986)).  In this case, however, viewing the evidence in the light most favorable to Alan, and allowing all reasonable inferences in his favor, as we are required to do at this stage of the proceedings, we find that "reasonable minds" could draw more than one conclusion as to whether these transactions were the product of Alan's free will or the product of undue influence.

We note the defendants' argument that if undue influence existed, it was due to Betty's actions rather than their own.  Nevertheless,

---

[12]  Alan was unmarried and had no children at the time of these proceedings.

'It is immaterial whether undue influence is exercised directly or indirectly. In determining whether undue influence is present, a central focus is on the means used and the effect upon the donor. The underlying theory of the doctrine is that the donor is induced by various means to execute an instrument that, in reality, is the will of another substituted for that of the donor. We specifically reject the contention that a beneficiary must be the one who exerts the undue influence.'

*In re Estate of Norton*, No. E2010-02304-COA-R3-CV, 2012 WL 587481, at *6 (Tenn. Ct. App. Feb. 23, 2012) (quoting *Estate of Glasgow v. Whittum*, 106 S.W.3d 25, 31 (Tenn. Ct. App. 2002)).

We also recognize that the defendants argued on appeal that even if summary judgment was improper on the aforementioned grounds, it should have been entered on the alternative bases of the statute of limitations, waiver or estoppel. Given Alan's assertion that he did not fully understand the consequences of executing the Amendments until this litigation arose, and considering the trustee/beneficiary relationship that existed here, we cannot say that there is no genuine issue of material fact regarding the elements of these defenses. *See SecurAmerica Business Credit v. Schledwitz* , 2011 WL 3808232 (Tenn. Ct. App. Aug. 26, 2011) (" *Absent a trust relationship* or fraud, contracting parties are charged with the duty of looking out for themselves.") (emphasis added).

In conclusion, we find that the defendants properly supported their motion for summary judgment by establishing that they had complied with the terms of the trust documents, and specifically, the Amendments to the ACC Grantor Trust.[13] The burden then shifted to Alan to establish that genuine issues of fact existed. He attempted to demonstrate that the trust documents were void, either because Exhibit A was fabricated or because he executed the documents due to undue influence. We conclude that Alan failed to present evidence establishing a genuine issue of material fact with respect to the authenticity of Exhibit A. As such, we affirm the trial court's decision to grant partial summary judgment on the issues surrounding the terms of the family limited partnership documents and the trust documents, and whether Alan had received the distributions to be made to him under the trust documents as written. However, we find that genuine issues of material fact remain with regard to the issue of undue influence. Therefore, we reverse in part the trial court's order granting partial summary judgment to the defendants and remand for further proceedings.

---

[13] "A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance." Tenn. Code Ann. § 35-15-1006.

### B.    Bifurcation

Alan also argues on appeal that the trial court abused its discretion in bifurcating the issues on appeal.   Again, the trial court ruled that "the issues of (1) the adequacy of distributions from the Trusts to the Plaintiff and (2) the tort claims seeking direct recovery under tort theories are so distinct and separable from one another that a trial of the first issue alone may be had without injustice."   The trial court eventually granted partial summary judgment  in favor of the defendants on the first set of issues, regarding the terms of the family limited partnership documents and the trust documents; whether Alan received the distributions to which he was entitled under the trust documents; and whether the defendants breached their fiduciary duties in conducting their responsibilities as trustees.   Thereafter, Alan voluntarily dismissed all remaining claims not addressed by the order granting partial summary judgment.

On appeal, Alan argues that the trial court abused its discretion in bifurcating the issues, and he asks this Court to remand for a single jury trial on all issues.   In response, the defendants argue that the issue regarding bifurcation is now moot, due to the subsequent voluntary dismissal of the bifurcated claims.   Defendants claim that "there are no bifurcated claims to address" at this point, and they point out that it would be impossible for this Court to remand for a trial on all of the issues.

As we explained in ***Davis v. McGuigan***, No. M2007-02242-COA-R3-CV, 2008 WL 4254150, at * (Tenn. Ct. App. W.S. Sept. 10, 2008) *rev'd on other grounds* 325 S.W.3d 149 (Tenn. 2010):

> A plaintiff is generally permitted to take a voluntary nonsuit of his case. *See* Tenn. R. Civ. P. 41.01. Upon doing so, however, there is no longer any existing controversy regarding those claims which the plaintiff voluntarily dismissed. Accordingly, this Court cannot entertain an appeal related to the claim [] which the [plaintiffs] voluntarily dismissed. *See City of Johnsonville v. Handley*, No. M2003-00549-COA-R3-CV, 2005 WL 1981810, at *11 (Tenn. Ct. App. Feb. 6, 2005) (citing to . . . *Martin v. Washmaster Auto Ctr., Inc.*, No. 01-A-01-9305-CV-00224, 1993 WL 241315 (Tenn. Ct. App. July 2, 1993) ("No present controversy exists after the plaintiff takes a nonsuit.")[.]

Because there is no longer any controversy with regard to the previously bifurcated, and now dismissed, tort claims, we will not consider whether the trial court abused its discretion in bifurcating those claims in the first place.

### C.    Attorneys' Fees

The defendants have requested that we award them all attorneys' fees, costs and expenses incurred on this appeal, to be paid either by Alan Cartwright and/or his beneficial interest in the ACC Grantor Trust. As the basis for this request, the defendants cite Tennessee Code Annotated section 35-15-709, which provides that a trustee is entitled to be reimbursed out of the trust property, with interest as appropriate, for expenses that were properly incurred in the administration of the trust, and they also cite section 35-15-1004(a), which provides, "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."

We also note that after portions of Alan's initial brief were stricken due to its lack of appropriate citations to the record and relevant authority, he was permitted to file a supplemental statement of facts, and the defendants submitted a separate request for an award of the attorneys' fees they incurred in responding to that supplemental statement of facts.

Exercising our discretion, in the interest of justice and equity, we hereby award the defendants the reasonable attorneys' fees and costs they incurred in responding to the supplemental statement of facts, with this amount to be paid by Alan Cartwright personally. The chancellor should determine a reasonable award of fees for this purpose on remand. As for the remaining attorneys' fees, given the issues in this case and the fact that we are remanding for further proceedings, we believe that it would be premature for us to determine at this point who should be responsible for the parties' attorneys' fees. Therefore, the request for an award of the remaining attorneys' fees, costs and expenses is respectfully denied.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court in part, and we reverse in part and remand for further proceedings, to include the determination of a reasonable award of attorneys' fees and expenses to the defendants. Costs of this appeal are taxed equally to the appellant, Alan Cartwright, and his surety, and to the appellees, Alice Cartwright Garner, et al., for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.